ST. LOUIS SAFE DEPOSIT & SAVINGS BANK, Respondent, v. THE KENNETT ESTATE AND MERMOD-JACCARD JEWELRY COMPANY, Appellants.

St. Louis Court of Appeals, April 28, 1903.

1. **Alley, Obstruction of:** NUISANCE, REMOVAL: EASEMENT GRANTED BY DEED. Two adjoining lot-owners by written contract agreed to maintain a private alley, described by metes and bounds, and they mutually granted to each other a permanent easement in the alley or "strip of ground to the end that they may have light and air from and over said strip" and have the permanent use of the strip as a passageway for themselves, their tenants, successors, assigns and legal representatives. *Held,* that a smokestack and oriel windows were unwarranted encroachments on the private alleyway, that the former was a nuisance, and that both were in contravention of the contract.

· 2. ———:· ———: ———: INJUNCTION, MANDATORY. Defendants constructed a building on the line of a private alley, separating it from plaintiff's building, and constructed a large sheet-iron smokestack which was set on an elbow emerging from the rear wall of the building into the alley at the second story, and rose above the eighth story. The smokestack projected into and occupied one-third of the alley's width, and extended within eight feet eight inches of plaintiff's building, and the heat which radiated therefrom made it necessary in the summertime to close the windows of the offices in plaintiff's building on that side, made some of the rooms untenantable, and also diminished the light and air which would otherwise have come to plaintiff's building from the alley. *Held,* that plaintiff was entitled to enjoin the maintenance of such smokestack as a continuing nuisance and compel its removal.

3. ———: ———: CONTRACT, INJUNCTION AGAINST A BREACH THEREOF. A party may restrain a continuous breach which is beneficial to him, and stand on the very letter of his obligation, for a party can not make a solemn obligation, and then disregard it on the plea that no harm will result to the other party.

4. ———: ———: LACHES. Where, on the erection of defendants' building, plaintiff, an adjoining owner, objected to the construction of a smokestack which extended into a private alley between the adjoining property as a breach of his rights under the contract for the maintenance of the alley, mere delay in bringing suit to restrain the maintenance of such smokestack did not constitute laches sufficient to bar plaintiff from relief.

5. ———: ———: COVENANT: IRREPARABLE INJURY. The continuance of a breach of a covenant respecting real property combined with permanent and irreparable injury may be and is frequently restrained.

6. ———: ———: CIRCUMSTANCES, NO BAR AGAINST SUING. Where on construction of defendants' building, plaintiff, an adjoining owner, objected to the maintenance of a smokestack extending into a private alley jointly owned by plaintiff and defendants as a breach of the contract for the maintenance of the alley, and complained to the secretary of one of the defendants, who was an attorney, and who informed him that, by virtue of a recent decision of the courts, defendants were entitled to so maintain such smokestack, whereupon plaintiff left, but appeared not to be convinced, and was not aware of his legal right to enjoin the same until a long time thereafter, and could not have determined the extent of the inconvenience until after the stack was completed. *Held*, that plaintiff was not barred by acquiescence from subsequently suing to enjoin the maintenance of the stack.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

AFFIRMED.

### STATEMENT.

The petition of the plaintiff states a cause for equitable relief from certain encroachments on a private alley which the plaintiff owns in common with defendant, the Kennett Estate, and for the abatement of nuisances maintained by the defendants.

Plaintiff is a corporation which owns and occupies a two-story building standing on a lot twenty-two feet wide and one hundred and seven and one-half feet deep, on the north side of Locust street in the city of St. Louis. This building covers the entire lot, has been there for many years and is occupied by the plaintiff for the transaction of a safe deposit and banking business. Plaintiff's main banking business is conducted on the first floor, its clerks and bookkeepers working on the east side of the room next to the alley in question. There are rooms, too, on that side for the use of customers who wish to look over their papers and transact other business, and similar rooms on the second floor. The building is lighted and ventilated through two front windows in the first story and four in the second, and on the east side through six windows below and ten above, opening on the alley.

The Kennett Estate owns the lot east of the plaintiff's premises, immediately across the alley and at the northwest corner of Locust street and Broadway, two main thoroughfares of the city of St. Louis, the former running east and west and the latter north and south. The situation of the respective properties will be understood from the following plan:

St. Louis Safe Deposit Bank v. Kennett Est.

Prior to 1897 a four-story building stood on the Kennett lot, but it was destroyed by fire sometime that year. The building standing there at present was erected during the years 1898 and 1899, and completed early in the latter year. It was designed for the use of the Mermod-Jaccard Jewelry Company, which took possession of it in May, 1899. That building is eight stories high, with a front of more than one hundred feet on Broadway and a wider front on Locust street. Its west wall stands flush with the west line of the lot it is built on; that is, with the east line of the alleyway. Bay windows project three feet and eleven inches from

all the stories above the first and overhang the alleyway. In the basement are furnaces and engines, and to carry the smoke and gas away, a large sheet-iron smokestack or chimney, four feet and four inches in diameter, emerges from the west or rear wall of the building eleven feet and six inches above the surface of the alley and forty-two feet north of Locust street, and rises above the eighth story. This smokestack projects into and occupies exactly one-third the alley's width and therefore extends within eight feet and eight inches of the east wall of plaintiff's building. Besides the smokestack, some water pipes originally ran up the rear of defendant's building, but those have been removed. An exhaust fan to force the hot air and smoke from the furnaces and engine room of the Mermod-Jaccard building was operated for a while, and annoyed the plaintiff's officers and employees, but that nuisance, as well as the water pipes, was abated and is no longer a subject of controversy.

The lot on which the Mermod-Jaccard building stands was owned in 1898 by six persons named Kennett who incorporated that year as the Kennett Estate and conveyed the property to said corporation. Before that date the following agreement had been executed by the Kennetts and the plaintiff's predecessor, the Safe Deposit Company of St. Louis:

"This agreement made and entered into this seventeenth day of December, A. D. 1880, by and between the Safe Deposit Company of St. Louis, a corporation of the city of St. Louis, and Agnes Kennett, John C. Kennett, Luther Kennett, Charles P. Kennett, William C. Kennett and Kenneth W. Kennett, also of said city of St. Louis.

"Witnesseth: That said parties have mutually agreed and do now mutually agree to and with each other that a certain strip or parcel of ground having a width of about thirteen feet and a length or depth of one hundred feet, in block No. 118, of said city of St.

Louis, and more particularly described as follows: beginning on the north line of Locust street one hundred and twenty-seven feet four inches west of Fifth street, running. thence northwardly one hundred feet, thence west about thirteen feet to the eastern line of the lot of said Safe Deposit Company, thence southwardly along such eastern line of said Safe Deposit Company one hundred feet to Locust street and thence east along the north line of Locust street to the point of beginning, the west line of said alley being one hundred and twenty-nine feet six inches east of the east line of Sixth street, shall be and remain an alleyway for the use and enjoyment of the parties to this contract as owners adjoining said strip of ground on the east and west thereof; and said parties do mutually grant to each other a permanent easement in said strip of ground to the end that they may mutually have light and air from and over said strip and that they may mutually and without obstruction or encroachment have the permanent use of said strip as an alley and passageway for themselves, their tenants, assigns, successors and legal representatives respectively.

"And said parties do now also mutually agree that they will in the proportions of one-half on the part of said Safe Deposit Company and one-half on the part of said other parties, jointly contribute towards the expense of keeping said strip of ground paved and free of nuisances.

"In witness whereof said parties have all executed these presents by signing and sealing the same with their respective seals and causing this instrument to be recorded. •

(Seal.) "SAFE DEPOSIT COMPANY OF ST. LOUIS,

"By JOHN R. LIONBERGER, President.

"Attest: G. A. HAYWARD,

"Secretary of Safe Deposit Company of St. Louis.

"AGNES KENNETT,

"J. C. KENNETT,

(Seal.)     "LUTHER M. KENNETT,
            "CHARLES P. KENNETT,
            "WILLIAM C. KENNETT,
            "K. W. KENNETT."

That instrument was duly acknowledged and recorded in the office of the recorder of deeds of the city of St. Louis.

The allegations of the first count of the petition, with which we are alone concerned, are that the bay windows and the smokestack in the rear of the Mermod-Jaccard building overhang or extend into the alleyway, in violation of the plaintiff's covenanted rights under the above contract and, moreover, are nuisances which continually annoy the plaintiff's officers, employees and customers, interfere with the prosecution of plaintiff's business, render its building uncomfortable and parts of it uninhabitable at times, diminish its value and do irreparable injury. It is charged that the smokestack and bay windows perceptibly obstruct the ventilation and light of the plaintiff's building, thereby impairing its usefulness and comfort, and that the smokestack heats the surrounding atmosphere so much that it often becomes necessary, in the summer time, to close the windows on the east side; that currents of hot air are blown into those windows and the temperature raised in the building, or portions of it, so high that plaintiff has been forced to abandon the use of some rooms. It is also charged that the obnoxious structures constitute a permanent obstruction of the alley, prevent the plaintiff and its patrons from having free ingress and egress, and are in derogation of the rights guaranteed to plaintiff by the foregoing instrument.

The answer of the Mermod-Jaccard Company is a general denial. That of the Kennett Estate admits the ownership of the lots as stated in the petition, the execution of the above contract, the erection of the eight-story building on the corner, with its western line coincident with the line of the private alleyway, and that it is oc-

cupied by the Mermod-Jaccard Jewelry Company under a lease for twenty years, beginning May 1, 1899. The answer denies that either of the defendants has refused to observe the provisions of the above-quoted agreement, but admits that in the erection of the Mermod-Jaccard building the smokestack was built into the alley, as were also the water pipes and bay windows, and further admits that defendants are now maintaining those structures as built; denies that the structures were put there without the consent of the plaintiff, but avers they were constructed with plaintiff's full knowledge and consent and denies that they shut out the light and air or prevent the plaintiff from receiving light and air from the alley into its building.

To the answer of the Kennett Estate the plaintiff filed a replication in the nature of a general denial.

There is testimony that the smokestack and bay windows diminish the light received into plaintiff's building from the alleyway about twenty-five per cent and affect the ventilation; and there is testimony that the light and ventilation are not materially affected. The drift of the evidence for the defendants on these points is that whatever diminution of light is noticeable is due to the erection of the eight-story building immediately east of the alley and that the light and ventilation of plaintiff's building would be necessarily as much diminished by the new building without the projecting parts as with them. The evidence, however, shows without conflict that the heat thrown off by the chimney is great enough to render plaintiff's building uncomfortable during the summer, and that in some portions of it the heat is unendurable. Three of the alley windows in the first story of plaintiff's building have to be kept shut most of the time on hot days, and sometimes the glass in them becomes so heated that a person can scarcely bear his hand on it. The same effects from the heat are noticed above, and as the rear offices in the second story depend entirely on the alley windows for

light and air, they are unusable. In one of the apartments upstairs, used as a dining-room, the windows have to be closed in the summer time on account of the heat from the chimney.

The testimony is that plaintiff's property is worth about $125,000.

While the defendants' building was in process of construction there were several conversations between James W. Bell, president of the plaintiff corporation, and John F. Shepley, secretary of the Kennett Estate, in regard to the encroachments, but the talks were chiefly about the bay windows. Bell objected to the windows but testified that he did not observe the smokestack until it was finished. The first conversation occurred when the new building had progressed to the second story and the windows in that story were beginning to show. At that time only the elbow of the smokestack protruded beyond the wall, and as it stood forty-two feet back in the alley it may not have been very conspicuous. The substance of Bell's testimony is that in his various conversations with Shepley, the latter promised to remedy the grievances of which Bell complained, and to make conditions satisfactory.

As we gather from the testimony, there had been litigation in one of the courts of the city of St. Louis about some overhanging windows in what is known as the Chemical building, with the result that the court held those windows were lawful structures. Shepley was a lawyer and concluded that that decision gave the Kennett Estate the right to build the smokestack and windows in dispute into the alleyway, as was done. Shepley told Bell the question of taking down the smokestack and windows was settled by said decision and it was not worth while to discuss the matter.

It is contended by the defendant that Bell yielded the point about the smokestack and agreed to let it remain provided it was painted white; but Bell positively denies making the agreement and says that what

really passed was that when the alley wall of the
Mermod-Jaccard building was painted they (the Ken-
nett Estate managers) spoke of painting the smoke-
stack too, to improve the light.

Shepley swore conversations came up between him
and Bell while the building was under construction and
some disputes occurred, but that they were amicably
settled; also that he and Bell went out into the alley
and looked at the building when the brickwork was
above the second story and the base or elbow of the
smokestack had just been put in; that Bell then objected
to the appearance of the stack and he (Shepley) was also
surprised by its appearance, not knowing at the time
whether it was to go up along the wall of the building
inside the air shaft or in the alley; that Bell first called
his attention to its location and he (Shepley) went to see
the architects about it and they said its location could
not be changed without changing the arrangement of
the building.   He afterwards saw Bell and told him he
would be glad to do anything he could to have pleasant
relations.   In that connection Shepley testified as fol-
lows:

"Q. Now, won't you tell us what took place at the
interview between you and Mr. Bell, when Mr. Judson
was present?  A.  I told him we didn't recognize any
responsibility to take that stack out of the alley, that we
would be glad to do it if we could, and there was some
little discussion as to whether we were bound or not;
and I did say, as he says, that I thought that the decision
of the circuit court in the controversy between the
owners of the Chemical building and the owners of the
Union Trust building was conclusive; that is, that I
thought that the court had decided that correctly and
that would govern this case, because I reasoned, *a
fortiori,* a rule that applied to the use of a public street
would apply—I mean a public alley—would apply to an
alley in which only a qualified easement had been sur-
rendered.   I stated so to Mr. Bell.   Mr. Judson was

present. I don't remember whether there was any dissent from my opinion or not; I don't remember that there was any further discussion, and I think that settled it.

"Q. You didn't learn that Mr. Judson took a different view until this suit was filed? A. I don't remember. He was standing right by us. We were all three standing together. I don't remember his expressing any opinion about it at all. I am sure he didn't assent to my proposition, but whether he dissented or not, I don't remember. . . . But the stack was adverted to and very little was said about the oriel windows, though Mr. Bell did advert to those as being an obstruction to the light; and he further objected to the water pipes which came up through the alley, and to that we confessed we had no right; and I said I would concede that those water pipes we hadn't any right to put there."

The Kennett Estate put in some wheel guards at the corner of the alley at the request of Bell, as the water pipes forced wagons entering the alley to drive on the west side and they were likely to scrape the corner of plaintiff's building, and that disposed of the water pipe controversy. Shepley further testified as follows:

"Q. And what more, Mr. Shepley, was said, if anything, about the painting of your wall? A. When Mr. Bell complained of the smokestack he made—I will couple those together—he really never made any complaint about the oriel windows, except in a rather perfunctory way and with a smile; and I said 'We will do anything within reason that we can to neutralize the effect of those projections; we are anxious to satisfy you.' It was finally agreed between Mr. Bell and, I think, Mr. Kennett was present—at least I certainly agreed with Mr. Bell, as I understood, that we were to paint—the smokestack was then a bright red, or perhaps they had put a coat of black on it—that we would paint the smokestack and the walls of our building up to a

certain point that I forget, but I think it was the second story, white—we would paint that with white paint. We put actually five coats on; and after I had made that promise it was discovered that white paint wouldn't work on the stack. I don't know why but it didn't, and they put yellow on, and I informed Mr. Bell of that, that yellow was the best color we could make. It was a light yellow instead of white." . . .

"Q. And what did Mr. Bell say, if anything, in regard to those acts? A. Well, I can't say that Mr. Bell said any—I mean I can't repeat a single word he said; but he made the impression on me —

"Objected to.

"Witness: the substance of what he said to me was to the effect that he was satisfied."

Shepley swore he never heard any complaint of the heat from the smokestack until the autumn of 1900.

In regard to the conversations about the suit over the Chemical building windows, Shepley stated that Mr. Frederick Judson, one of plaintiff's attorneys in this suit, happened to be present. But Bell swore Judson was by in a casual way and not as counsel, and Shepley does not deny that statement. Shepley, on that occasion, spoke about the decision in regard to the windows of the Chemical building and said he (Shepley) had knowledge of it through the newspapers. He mentioned it to Bell and testified in regard thereto as follows:

"Q. You referred to it with some positiveness of manner, didn't you? A. I was very positive that we had a right to put that stack up; at least I hadn't any reasonable doubt at that time.

"Q. You didn't understand that you required Mr. Bell's consent to put it up, did you? A. No, sir; I didn't.

"Q. You understood you had a legal right to put it up? A. I did.

"Q. And you put it there for that reason—be-

cause (interrupting).—A. No, sir, I will explain to you. So fár as I am personally concerned, when the plans were drawn I was unconscious of the fact of the stack projecting into the alley, and when Mr. Bell called my attention to it I made up my mind if it were unlawfully there it would have to be removed, and if it were not unlawfully there it wouldn't have to be removed, and I concluded it was lawfully there.

"Q. You talked with Mr. Bell and gave him to understand your positive conviction that it was lawfully there? A. Yes, sir; you and Mr. Bell both. . . .

"Q. Now, Mr. Shepley, wasn't this about the condition of matters in that conversation, whether the one in which I was present or the other; there was no discussion as to the bay windows or the smokestack, for the reason that you insisted they were rightfully there; the other matter you conceded, the water pipes were out of place, and you called Mr. Bell's attention to the fact that his white stone there was also infringing on the alley? A. No, sir; about all the conversation we had was with reference to the smokestack and some reference to the bay windows; the water pipes didn't take ten seconds. I knew the water pipes ought to be taken out of the alley; I knew they were a violation of the covenant.

"Q. You made a distinction between them, the bay windows and the smokestack, because the other commenced above the surface of the ground? A. I made that distinction in my own mind. . . .

"Q. Now, you took a definite position, as I understand it, that while you were bound to keep the alleyway clear on the surface, you had an unlimited right to projections above it? A. No, sir.

"Q. Did Mr. Bell agree or not agree to that proposition? A. I can't say that he expressed any conviction about it at all."

Shepley said of Bell's attitude as to his (Shepley's) assertion that the Kennett Estate had a right to make

those projections into the alley: "I do not know what he [Bell] conceded, but he said enough to convince me that he was perfectly satisfied provided we would paint those projections and the lower part of the smoke-stack." He said further that he could not tell what Bell said or that he expressed a conviction about the matter; that he (Shepley) did the talking on the legal proposition and assumed Bell would refer it to Judson.

Luther M. Kennett, the president of the Kennett Estate, testified he had a great many conversations with Bell but none specifically about the windows and smoke-stack; that possibly he and Bell discussed those structures and Bell, as he looked at them, "would smile and shake his head at times;" but they conversed about the painting of the wall and he understood it was painted to suit Bell and to let light into his room; that he could not say he ever heard Bell complain that they projected into the alley and obstructed the light; that Bell never asked that they discontinue the construction of the smokestack and he (Kennett) never understood they were doing anything Bell objected to. He testified further as follows:

"Q. Mr. Kennett, did you ever ask Mr. Bell for permission to put up that smokestack? A. No, sir.

"Q. Did you ever ask him for permission to put up those oriel windows? A. No, sir.

"Q. You put them up because you considered you had a right to put them up? A. That was my idea.

"Q. And you didn't consider that his assent was in any way necessary? A. No, sir.

"Q. All you wanted was to have a good neighborly feeling there? A. Perfectly.

"Q. And to do what was the right thing? A. Yes, sir.

"Q. And he complained that his light was diminished, didn't he, by the bay windows and the stack? A. After the thing was up he did.

"Q. After it was up? A. Yes, sir.

"Q.  After he had time to see what the effect was, then he complained to you that they did darken his place and you offered to paint them a light color to correct it, or a lighter color, didn't you?  A.  Yes, sir.

"Q.  Those were matters that you could do without taking them down and you were ready to do it to be agreeable?  A.  Yes, sir."

Bell swore he objected to the water pipes and especially objected to the chimney.

There was some testimony of experts that the heat from the smokestack can be abated so as not to disturb the occupants of plaintiff's building or interfere with its use, by putting an asbestos jacket or screen about it; also that considerable expense will be entailed by taking it down and changing its location to another part of the Mermod-Jaccard building.

There is an open light court in the rear of this building at one corner of which, and just outside the court in the alleyway the smokestack rises, as is shown in the diagram.

At the conclusion of the testimony the circuit court entered judgment that the defendant abate and remove the smokestack so that it would not project over the private alley, within ninety days, and that the defendants be perpetually enjoined from maintaining any other smokestack to project into the alleyway, and if they failed to comply with the order of removal that the sheriff remove the smokestack.

*Valle Reyburn* for Mermod & Jaccard Jewelry Company, appellant.

A court of equity will interfere by mandatory injunction only where extreme or serious damage will be inflicted upon plaintiff from declining such aid, and will not exercise this great and extraordinary power where the effect would be to inflict great injury upon

defendants without affording plaintiff any material good, nor where the decree would operate oppressively. 2 Story Equity (13 Ed.), sec. 925, p. 228; Jones Easements, sec. 885, p. 710; Washburn Easements (4 Ed.), p. 749; 1 Spelling, Injunction and Other Extraordinary Remedies (2 Ed.), sec. 234; Bailey v. Culver, 84 Mo. 531; Lanfranchi v. MacKenzie, 4 Equity Cases (1867) 420; Railroad v. Ala., etc., 96 Ala. 272; Railroad v. Railroad, 184 Pa. 227; Starkie v. Richmond, 155 Mass. 188; Darrell v. Pritchard, 12 Jurist N. S. 16; Robson v. Whittingham, 12 Jurist N. S. 40.

*Arthur B. Shepley* and *E. S. Robert* for defendant, the Kennett Estate.

(1) Plaintiff, by standing by while defendant expended large sums of money in erecting the smokestack, without either notifying defendant to desist or attempting to prevent the work, has lost its right to equitable relief. Rankin v. Charles, 19 Mo. 491; Planet Co. v. Railroad, 115 Mo. 613; Sherlock v. Belt Line, 142 Mo. 172; Jones v. Canal Co., 2 Malloy 219; Canal Co. v. Lloyd, 18 Vesey 515; Ripon v. Hobart, 3 Mylna & K. 169; Canal Co. v. King, 16 Beav. 630; Railroad v. Railroad, 3 DeG. M. & G. 341; Wicks v. Hunt, Johnson Ch. (Eng.) 372; Senior v. Pawson, L. R. 3 Eq. 330; Bassett v. Salisbury, 47 N. H. 426; Attorney-General v. Railroad, 24 N. J. Eq. 49; Traphagen v. Jersey City, 29 N. J. Eq. 49; Water Lot Co. v. Bucks, 5 Georgia 315; Whitney v. Railroad, 11 Gray 359; Starkie v. Richmond, 155 Mass. 188; Ware v. Smith, 156 Mass. 186; High on Injunction, secs. 786 and 1159; Kerr on Injunctions (2 Am. Ed.), p. 388; Wood on Nuisance, secs. 804-806. (2) Especially is this true where the granting of a mandatory injunction would "inflict serious damage on the defendants without doing plaintiffs any material or practical good." Bailey v. Culver, 84 Mo. 531; Isenberg v. East India Co., 3 DeG. J. & S. 263; Stanley v. Shrews-

bury, L. R. 19 Eq. 616; Jacomb v. Knight, 3 DeG. J. &. S. 533.

*Judson & Green* for respondent.

(1)    The projections built by the Kennett Estate in said alley were an infringement of respondent's rights under the contract of December 17, 1880.    Attorney-General v. Williams, 140 Mass. 329; Salisbury v. Andrews, 128 Mass. 336; Cook v. Ferhert, 145 Mo. 462; Books v. Reynolds, 106 Mass. 31.    (2)    Respondent's rights in said easement are based upon an express contract or covenant, are strictly legal rights, and, therefore, this is not a case in which the right to equitable relief can be barred by laches.    No mere laches, short of the period of limitation, will bar the right to equitable relief in such a case.    Lindell Real Estate Co. v. Lindell, 142 Mo. 79; Pomeroy on Eq. Juris., sec. 817; Fullwood v. Fullwood, L. R. Chanc. Div. 176.    (3)    Respondent was ignorant of its legal rights in said alleyway in reference to these projections, having been misled by the positive assertions of appellant's attorney.    Laches can not be imputed to one who is ignorant of his rights, and for that reason fails to assert them.    Garesche v. Levering Inv. Co., 146 Mo. 436; Schaidt v. Bland, 66 Md. 145; Perkins v. Turnpike Co., 48 N. J. Eq. 499; Ode v. Railroad, 56 Hun 199; Lasher v. McCreary, 66 Fed. 834; Smith v. Miller, 66 Tex. 74; Webb v. Brandon, 51 Tenn. 285; Heirs v. Brown, 2 Ky. 102; Long v. Anderson, 62 Ind. 537; Bybee v. Railroad, 139 U. S. 663.    (4)    Even if it were possible to cover the smokestack with non-conducting material, in such a manner as to prevent the radiation of heat, yet respondent is entitled to have it removed.    Johnson v. Hyde, 32 N. J. Eq. 446.

GOODE, J.—This case presents two phases, and the rules of law applicable to its solution vary somewhat according to the one regarded.    We have to deal

with a breach of the agreement made between the grantors of the parties that the private alleyway should be maintained for the benefit of the abutting properties, and with the nuisance created by the construction and use of the smokestack.

And first we must determine the scope of the agreement. The defendants contend the position and use of the smokestack constitute no violation of it, because the commodious use of the surface of the alley by pedestrians and vehicles is not hindered thereby. This construction of the instrument is incorrect; for its language expresses the intention to create an easement in the alley in order to afford the adjacent buildings light and air as well as to insure a passageway. Defendants' counsel reason from the fact that the words, "without obstruction and encroachment," relate to the use of the alley as a passage and not as a means of furnishing light and air to the houses; but their argument will not bear examination, for it leads to the conclusion that the light and air received into the building from the alley may be entirely excluded without violating the agreement, provided the alley is left unobstructed for passage. The plain purpose of the parties to the agreement was to enhance the usefulness, comfort and value of their respective properties by leaving a space of the designated width open between them, not only for travel, but for light and ventilation. The words, "and without obstruction and encroachment, have a permanent use of said strip as an alley and passage," are grammatically connected with use of the strip for passage; but there are these other words whose explicit purpose is to create an additional easement for light and air:

"And said parties do mutually grant to each other a permanent easement in said strip of ground to the end that they may have light and air from and over said strip."

That clause shows the intention was to make the

alleyway a means of permanently receiving light and air into the buildings.

To collect their meaning and purpose, such covenants as we have here must be construed with reference to the situation of the property affected and its present and prospective use, as well as to the language employed. Salisbury v. Andrews, 128 Mass. 336; Schwoerer v. Boylston Market Ass'n, 99 Mass. 285; Brooks v. Reynolds, 106 Mass. 31; Atty.-Gen. v. Williams, 140 Mass. 329. And we may discern by a glance at the subject-matter of the contract, that it was quite as important to plaintiff's long and narrow building, which depends chiefly on its eastern windows for light and air, to have the alleyway remain open and unobstructed above, as it was to have it free for passage over its surface. The importance to the plaintiff of a permanent provision for light and ventilation is yet more forcibly impressed, if we call to mind the high value and the advantageous situation of the plaintiff's lot for business purposes, which render probable its improvement in the future by the erection of a tall and expensive building like the defendants'. Similar covenants came up for construction in the cases cited above and for similar reasons were held to grant an easement in the space above the surface of the private way reserved, as well as in the surface itself; and, indeed, the meaning is too obvious to be mistaken. Brooks v. Reynolds, 106 Mass. 31.

The full force of the covenant for air from the reserved opening is to be apprehended; and we take it to mean what it says, namely; "from and over;" that is, the whole space above the earth. We also think that by "air" is meant the atmosphere at its outdoor temperature; air as pleasant and refreshing as the weather permits; not air raised to a supernormal temperature by artificial heat and radiated into the neighboring buildings in hot currents, which instead of cooling and purifying the confined atmosphere of a room, render

it less comfortable and even intolerable. Moreover, the agreement says the dedicated strip of land "shall be and remain an alleyway for the use and *enjoyment* of the parties to the contract as owners adjoining said strip of ground." The word "enjoyment" must be erased from the instrument if the owner of the adjacent premises may be driven to abandon part of them and made uncomfortable while using the rest. If one portion of the alley's space may be occupied with opaque bodies which interfere with light and ventilation, another portion may be, and, by parity of reasoning, all of it; so that the covenant need not be respected at all. The smokestack is, both in its location and its effects, a palpable violation of the spirit and intention of the instrument.

But no court can accept the doctrine that contracts may be violated at will; and, therefore, while we are convinced the chimney sensibly interferes with the light and ventilation of plaintiff's house, we think the right to relief does not depend entirely on proof of that fact. A continuous violation of covenants in regard to the use and enjoyment of lands and tenements, especially if the consequent damages can not be readily estimated or compensated, presents a proper occasion for equitable relief by injunction. And as this case is on an express contract that a certain status shall not be altered, the essential fact is the breach, rather than the injury; for the covenantor is entitled to have the status maintained, as constituting the very purpose and consideration for which he bound himself. The extent of the injury is vital when a nuisance, unrelated to contractual rights, is the gravamen of the action; but if parties settle their rights in regard to a parcel of land by covenants, these must be observed whether their non-observance will inflict injury or not. It has been held that a plaintiff may restrain a continuous breach which is beneficial to him and may stand on the very letter of his obligation; for a party may not make a solemn engagement and then

disregard it on the plea that no harm will result to the
other party.   Hall v. Wesster, 7 Mo. App. 56; Ives v.
Edison, 50 L. R. A. (Mich.) 134; Johnston v. Hyde, 32
N. J. Eq. 446; Merritt v. Parker, 1 N. J. L. 400; Tillot-
son v. Smith, 32 N. H. 90; Hulme v. Shreve, 3 Gr. Ch.
116; Dewey v. Bellows, 9 N. H. 282; Dickerson v. Canal
Co., 15 Beav. 260; 3 Parsons, Contracts, *213.   Those
cases dealt with breaches of covenants which were
thought to be beneficial to the complaining party, who
was nevertheless afforded redress; and in some instances
by an injunction commanding the removal of encroach-
ing improvements.   Hall v. Wesster, supra, decided by
this court, was a case in which that relief was sought
and granted to compel the defendant to discontinue the
use of his premises as a dairy, contrary to the reserva-
tions in certain deeds.   The class of actions to which
that one belonged was distinguished from those to abate
nuisances productive of special injury to complaining
parties, and it was said not to be a nuisance case, there
being no proof the plaintiff was damaged at all.   But
the opinion says:

"Where all the purchasers of an estate are bound
by restrictive covenants not to use their houses for cer-
tain purposes, an injunction will be granted to restrain
a breach of the covenant, without any regard to the
question of the character or degree of annoyance.   The
objection may be founded on the merest whim.   Thus,
in London, where houses were sold over a tract of fifty-
seven acres, and the covenants of the purchasers were
that no new building erected on the land should be oc-
cupied otherwise than as a private residence, the use of
a building for a school was held to be a breach of the
covenant and was restrained.   German v. Chapman, L.
R. 7 Ch. Div. 271.   The effect of such restrictions in-
serted in contemporaneous conveyances, under the cir-
cumstances set forth in these pleadings, confers a right
in the nature of an easement in all the lots in the tract,
on each person acquiring by such deeds, and enters into

the consideration by increasing the price of some lots, and diminishing, perhaps, that of other lots in the same tract.''

In Dickenson v. Canal Co., 15 Beav. supra, it was said:

''If it be a contract duly entered into between the parties, it is no answer to a violation of it to say, that it will not inflict any injury upon one of the contracting parties. . . .

''It is therefore, in my opinion, a matter of no moment in this case, that the plaintiffs have given no evidence of any actual damage done to them, or of any actual diminution of water at their mills. Having established that the acts of the defendant are a violation of the contract entered into between them and the plaintiffs, and a violation of the act of Parliament passed to carry such contract into effect, the plaintiffs are entitled to call upon this court to protect them in the enjoyment of that right which they have so purchased, and this court is bound to preserve it from being broken in upon.''

In Hulme v. Shreve, 4 N. J. Eq. 116, the court said:

''It may be remarked, that the complainants are entitled to the use of the whole of the bed of this stream, as far back as the flow, in the manner they have been accustomed to use it, and it behooves any one who would change that manner of use, to show most conclusively, that the change could not injure him. I do not, however, intend to express an opinion that the complainants could be compelled to submit to such change, even if no injury could be proved to result therefrom.''

Of similar import are Ives v. Edison, Johnston v. Hyde, Tillotson v. Smith, and Dewey v. Bellows, supra.

It is important to maintain the force of agreements concerning the use and enjoyment of easements, since there is constant temptation to disregard them and then, on one plea or another, seek to escape the consequences. When such privileges are deemed of sufficient value by

property-owners to furnish the subject-matter of a negotiation and the consideration of a contract, they fall, like other agreements, within the obligatory force of the law. The courts vigilantly guard a dominant tenement in its full possession of an easement, and a servient one from an increase of the servitude, regardless of whether injury follows an abridgement of the easement or an enlargement of the servitude. Easements are property; servitudes are burdens on property; and an owner is entitled to complete dominion over and enjoyment of his property except in so far as he voluntarily relinquishes those rights.

And it is immaterial whether the easement or servitude was created by private or public grant, or by prescription.

Where a way across lands had become attached to a farmstead by immemorial use for agricultural purposes and the occasional carrying of materials to improve the farm buildings, it was held no right existed to transport materials over it for building new houses and that such use of the way would be perpetually enjoined, as it would increase the servitude. Wimbleton Conservators v. Dixon, L. R. 1 Ch. Div. 370.

In a case where a turnpike company had been granted the right to lay out a turnpike and to maintain three toll gates along its route, it was held another gate and an appurtenant dwelling on the turnpike where it passed through the complainant's land, was an increase of the servitude which would be prevented by ordering the house removed. Perkins v. Turnpike Co., 48 N. J. Eq. 499. See, also, to the same effect, Williams v. James, L. R. 2 C. P. 577; Henning v. Burnett, 8 Ex. 187; Cowling v. Higginson, 4 N. & W. 245.

In the present case we not only have a breach of a covenant to consider, but a continuing breach which works continual damages to the plaintiff that can not be measured or made good by one or many money judgments. That equitable relief by the writ of injunction

is the appropriate remedy to redress such wrongs, is
settled law in this State.

In Railway Company v. Springfield, 85 Mo. 674,
the defendant was enjoined from fencing up the plain-
tiff's tracks in violation of a contract between the city
and the railway company, on the ground that money
damages would not be compensation. The opinion says:

"Some reason must be assigned to justify a resort
to a court of equity in case of a threatened breach of
contract, or the disregard of a contract duty, or the inva-
sion of rights acquired thereunder. That the appellant
will be damaged by the disconnection of portions of its
road is clearly enough alleged. It is very clear that the
damages are such as can not be fully compensated by
any action at law. They are scarcely capable of any
fair estimation. This is sufficient to give the court ju-
risdiction. Equity will interfere to protect and secure
the enjoyment of a franchise secured by statute, because
it affords the only plain and adequate remedy."

Cook v. Ferbert, 145 Mo. 462, was a suit to restrain
the obstruction of a neighborhood road ten feet wide
which Cook had set apart for the use of himself and co-
plaintiffs after purchasing the strip of ground from
Ferbert for that purpose. It was held that if the plain-
tiffs were entitled to a way over the strip, an erection
which made its use less convenient and beneficial was
a wrongful interference with their privileges, and that
as in such matters there is no adequate remedy at law,
injunction was the proper remedy; citing Lakenan v.
Railroad, 36 Mo. App. 363; Devore v. Ellis, 62 Iowa
505; Collins v. Slade, 23 W. R. 199; McCann v. Day, 57
Ill. 101. We know of no modern decision that when
the breach of a covenant respecting real property is
combined with permanent and irreparable injury, the
continuance of the breach may not be restrained, while
numerous decisions to the contrary exist. Schwoerer
v. Market Assn., Brooks v. Reynolds, Salisbury v. An-
drews, and Atty.-Gen. v. Williams, supra, are Massa-

chusetts cases similar to this one, and the reports of that State furnish other apposite precedents. The following cases are also in point: Ackerman v. True, 75 N. Y. Supp. 695; Hulme v. Shreve, supra, Lux v. Haggin, 69 Cal. 255; Johnston v. Hyde, Ives v. Edison, supra; Ramsden v. Thornton, L. R. 1 E. & I, 129; Dickenson v. Canal Co., supra; Schaidt v. Blaul, 66 Md. 141; Fullwood v. Fullwood, L. R. 9 Ch. Div. 176; Atty.-Gen. v. Algonquin Club, 153 Mass. 447; Weber v. Gage, 39 N. H. 182; 1 High, Injunctions (3 Ed.), 849. We forbear to review those authorities, since to do so would unduly extend this opinion; but all of them are germane to the present controversy and afford precedents for its determination.

If we attend to the other aspect of the controversy, it is apparent that the maintenance and use of the smoke stack causes a well-nigh intolerable nuisance to the plaintiff and one which greatly impairs the value and usefulness of its property, not only for its present business, but for future improvements and uses. That plaintiff's building is so overheated by the smokestack as to molest the occupants, is scarcely disputed; or, if disputed, is proven to demonstration by the testimony. If there were no contract to settle the rights of the parties, the defendants would be prevented from using their own premises, much less the alleyway outside, in a manner that seriously interfered with the comfort of persons occupying or visiting plaintiff's building. It is ancient law that a person must use his possessions so as not to injure his neighbor and that a use which results in a permanent nuisance to his neighbor will be restrained by a court of equity. Smith v. McConathy, 11 Mo. 517; Ellis v. Railroad, 63 Mo. 131; Paddock v. Somes, 102 Mo. 226; State ex rel. v. Board of Health, 16 Mo. App. 108; Holke v. Herman, 87 Mo. App. 125, and cases cited therein. Preventing the diffusion of overheated or offensive air and gases to the discomfort of people in the vicinity and to the detriment of their property,

is no uncommon exercise of equity authority. Kirch-graber v. Lloyd, 59 Mo. App. 57; Whalen v. Keith, 35 Mo. 97; Huchenstine's Appeal, 70 Penn. St. 102; Campbell v. Seaman, 63 N. Y. 568. No remedy for such wrongs is adequate except one which puts an end to them. Successive actions for damages may be nearly or quite as much annoyance to the person who prosecutes them as the thing to be abated; and the only effective way to deal with these aggressions is to promptly stop them, unless the circumstances solicit measures less harsh.

When a court is asked to remove valuable structures as being a nuisance, several matters must be taken into account. Damages must be proven of a substantial and continuous character; it must appear that the loss to the defendant by granting the injunctive relief will not be out of proportion to the advantage to the plaintiff, and it must further appear that the mischief can not be remedied by more conservative action. Bailey v. Culver, 84 Mo. 531. If the damages are trivial, or if they can be made good by a legal judgment, or if the loss to the defendant by granting mandatory relief will be far more than the attendant benefit to the plaintiff, the writ will commonly be denied and the plaintiff left to his action at law. And if the court grants equitable relief, the decree will be as moderate as is consistent with effectually correcting the mischief. Courts are lenient in litigation like this and decline to compel alterations of permanent improvements further than is necessary to relieve a complainant from annoyance and loss. Tanner v. Wallbrunn, 77 Mo. App. 262; Zugg v. Arnold, 75 Mo. App. 68; Salvin v. Coal Co., L. R. 9 Ch. Div. 705; Ganut v. Fynney, L. R. 8 Ch. 8; Cook v. Forbes, L. R. 5 Eq. 166. But it is equally well settled that when the conditions imperatively call for it, the removal of costly structures must and will be ordered. 1 High, Injunctions (3 Ed.), 773; 2 Wood Nuisance (3

Ed.), 779; Campbell v. Seaman, supra, and numerous cases cited in the opinion.

The evidence in this case has convinced us that the injury sustained by the complainant is very great and continuous, and that there is no legal remedy at all adequate. The annoyance from the smokestack, if it remains in its present position, will go on indefinitely, to the detriment of the plaintiff's property and the serious impairment of its value. A fine building of many stories, will be far less desirable and, we think, scarcely profitable, if an immense hot chimney ascends near its upper windows. The fact that some of the rooms in the second story of the present building become so overheated they must be left vacant, proves that rooms in higher stories could not be rented to advantage. The constant loss can not be accurately estimated and plaintiff's damages awarded; and for that reason the nuisance must be abated.

We recognize that it will entail heavy expense to change the position of the smokestack. Doubtless the learned chancellor below was reluctant to order its removal, and we feel that way ourselves. But if the expense to the defendants of removing it is compared with the continuous loss to the plaintiff from its remaining in position, the equity of this point is seen to be largely in plaintiff's favor. The immediate expense of changing the smokestack will be much less than the damage to the plaintiff by the permanent impairment of its property.

Two experts say the pipe can be prevented from radiating heat by incasing it in an asbestos jacket or encircling it with some kind of a screen. This evidence has failed to impress us deeply, but maybe would influence us more were it not for the fact that either of the proposed devices would still further occupy the alley, in violation of the covenant held by the plaintiff. According to the opinion of one of the experts, the diameter of the pipe would be increased four inches by the

asbestos jacket; how much by the screen is not stated. To direct an additional occupation of the alley by encasing the stack would further subtract from the plaintiff's rights under the agreement regarding the alley's use.

After weighing the arguments which influence equity courts in granting or refusing mandatory injunctions against nuisances, we conclude that a remedy of that sort is called for by the facts presented in this case.

Both from the standpoint of the contractual rights of the plaintiff and from that of the defendants' tort in maintaining a nuisance, we find the plaintiff's cause to be meritorious, and have next to examine certain defenses which are affirmed to be good against either cause of action. These defenses are spoken of under the different titles of laches, acquiescence and estoppel, but they all come to this: that the conduct of the plaintiff's president (Bell) in consenting to the erection of the smokestack, or not preventing its erection, precludes the plaintiff from having it removed.

The delay in appealing to the law was not great in point of time; but it was sufficient for the Kennett Estate to expend, the while, the entire cost of the stack, and is sufficient, therefore, to bar the plaintiff if the other elements of laches exist. The theory of that doctrine as it is employed by equity courts, is that a complainant's delay in suing has put the defendant at a disadvantage; either from the loss of evidence, due to lapse of time, or from investing money which he would lose if his adversary's cause succeeded. Delay alone does not constitute laches nor bar relief. As was said in a discussion of the subject:

"It is an equitable defense and is often resorted to when the party who sets it up has no defense in law; and for this reason courts should be very cautious in applying this doctrine to defeat a rightful owner of land who, from neglect, which may be the result of the want of proper information, refrains from the assertion of

his rights until the presumption of abandonment arises from his course of conduct." Lasher v. McCreery, 66 Fed. 834.

In an opinion by the United States Supreme Court, it was said that the cases wherein a party was defeated by his laches, proceeded on the assumption that the party to whom it was imputed had knowledge of his rights and ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party had good reason to believe that the alleged rights were worthless, or had been abandoned; and that because of the change in condition or relation during this period of delay it would be an injustice to the latter to permit him to assert them. Galliher v. Cadwell, 145 U. S. 368.

So it has been decided that in order to charge a party with laches, it must appear the other party was injured by the delay, mere lapse of time being insufficient. Lindell R. E. Co. v. Lindell, 142 Mo. 61; Condit v. Maxwell, 142 Mo. 266.

Acquiescence is akin to the doctrine of laches, but implies a more definite assent to the acts complained of later. Lux v. Haggin, 69 Cal., supra. It is one phase of the law of estoppel, and in order for a party's action to be defeated by estoppel his behavior, either by silence, word or actions, must have been such as to induce his adversary to pursue a line of conduct which would redound to the latter's loss unless the inducing party was denied relief. Johnson-Brinkman Co. v. Railroad, 126 Mo. 345; Blodgett v. Perry, 97 Mo. 263; Bailey v. Perry, 51 Mo. 449. Generally speaking, for a party to be estopped either by statements which lead another to take a certain course, or by open assent to the course taken, or by silence when he should have spoken, it is necessary that he should have spoken or remained silent with full knowledge of his legal rights. Galbreath v. Newton, 30 Mo. App. 380; Blodgett v. Perry, supra; Taylor v. Zepp, 14 Mo. 474; Terrill v. Boulware, 24 Mo. 254; Newman v. Hook, 37 Mo. 207; Burke v. Adams, 80 Mo.

504. And it is likewise necessary that the party claim-
ing the estoppel should have relied on his adversary's
assent or inaction in altering his position, or doing the
thing subsequently charged to be wrong. If the truth
was known to both sides, neither can invoke an estop-
pel against the other because of misrepresentation or
inaction. Burke v. Adams, supra; Justice v. Lancaster,
20 Mo. App. 559; Bartlett v. Roberts, 66 Mo. App. 125;
Amy v. Ramsey, 4 Mo. 505; Thompson v. Reno, 12 Mo.
157; Eitelgeorge v. Bldg. Ass'n., 69 Mo. 52; Spurlock
v. Sproule, 72 Mo. 503; Acton v. Dooley, 74 Mo. 63;
Noble v. Blount, 77 Mo. 235.

That the doctrine of acquiescence is not different
in its application from that of estoppel is shown by the
following excerpt from an authoritative writer:

"This form of quasi estoppel does not cut off the
party's title, nor his remedy at law; it simply bars his
right to equitable relief and leaves him to his legal ac-
tion alone. In order that this effect may be produced,
the acquiescence must be with the knowledge of the
wrongful acts themselves, and of their injurious conse-
quences; it must be voluntary, not the result of accident,
nor of causes rendering it a physical, legal or moral ne-
cessity, and it must last for an unreasonable length of
time, so that it will be inequitable even to the wrongdoer
to enforce the peculiar remedies of equity against him
after he has been suffered to go unmolested, and his
conduct apparently acquiesced in. It follows that what
will amount to a sufficient acquiescence in any particular
case, must largely depend upon its own special circum-
stances." 2 Pomeroy, Eq. Juris., sec. 817. See, also,
High, Injunctions, 786.

That it is necessary for a party to know his legal
rights are being infringed in order to be precluded from
subsequent action in regard to the infringement, has
been declared in numerous cases and in many like the
one in hand. Perkins v. Turnpike Co., 48 N. J. Eq.;
Schaidt v. Blaul, 66 Md. supra; Weber v. Brander, 51

Tenn. 285; Heirs v. Brown, 2 Ky. 102; Long v. Brown, 66 Ind. 537; Bybee v. Railroad, 139 U. S. 663; Garesche v. Invest. Co., 146 Mo. 160; Ackerman v. True, supra. And that the party claiming the benefit of acquiescence or silence must have acted on it, is universally maintained by the decisions. Carr v. Glover, 70 Mo. App. 242; Smith v. Roach, 59 Mo. App. 115; Pelkinton v. Insurance Co., 55 Mo. 172.

In Garesche v. Investment Co., the Supreme Court of Missouri said, quoting from a writer:

"To fix acquiescence upon a party it must unequivocally appear that he knew or had notice of the fact upon which the alleged acquiescence is founded, and to which it refers. Acquiescence imports and is founded upon knowledge. Acquiescence can not arise unless the party against whom it is set up is aware of his rights. A person can not acquiesce in what he is ignorant of, nor can he be bound by acquiescence unless fully apprised as to his rights and all the material facts and circumstances of the case."

With the foregoing principles in mind, let us turn to the facts bearing on the several defenses in the nature of estoppel raised by the defendants. The secretary of the Kennett Estate, John F. Shepley, is a lawyer of reputation and experience, while Bell, the president of the St. Louis Safe Deposit Company, is a layman. The latter objected to the projections over the alley from the first, although it is not clear that his attention was immediately attracted by the smokestack. But that encroachment is far more objectionable than the oriel windows, and if Bell protested against the windows, it is unlikely that he consented to the chimney. Either Luther Kennett or Shepley testified that he *inferred* from Bell's remarks that he (Bell) yielded as to the smokestack; but that Bell never assented to it, we think, is certain. The testimony of those two witnesses proves these facts; Bell saw the projections and remonstrated

with Shepley; the latter referred to the decision in the Chemical building case, saying it settled their rights and there was no use discussing the matter. Bell seems to have been impressed by this statement, but neither he nor his attorney, as Shepley expressly testified, gave adhesion to the legal proposition laid down by Shepley, that the Kennett Estate had the right to build the projections over the alley. No doubt the extent of the annoyance the smokestack would cause was not realized until it was experienced. Plaintiff's officers could not apprehend in advance how unpleasant or intolerable it would render their rooms, or the importance of preventing its erection. Bell remonstrated and expressed dissatisfaction, but was somewhat reassured and somewhat disheartened by Kennett's and Shepley's promises and their declarations that they possessed the legal right to build projections over the alley. Those witnesses testified positively to telling Bell that while they were willing to do anything reasonable to preserve good feeling, they were acting within their rights and intended to build the windows and smokestack as they did. Shepley swore:

"I was very positive that we had a right to put that stack up; at least, I hadn't a reasonable doubt of it.

"Q. You did not understand you required Mr. Bell's consent to put it up? A. No, sir; I did not."

He further testified that he was unaware when the plans of the new building were drawn, where the smokestack was to be, and when Bell called his attention to it he "made up his mind that if it were unlawfully there it would have to be removed, and if it were not unlawfully there it would not have to be removed;" and he concluded that it was lawfully there and said as much to Bell. That Shepley and Kennett acted on their judgment is further borne out by Shepley's concession that the water pipes were unlawful, since they rose into the alleyway from the ground instead of springing from

the building above the ground.    The testimony leaves no doubt that Shepley and Kennett felt confident of their right to overhang the alley with parts of the building; that they intended to and did act on this theory and were not influenced by what Bell said, although Bell was influenced by what they said.    Every element of estoppel is, therefore, lacking to the plaintiff's defense.

The contention mainly relied on by the defendant is that the plaintiff ought to have begun an action to stop the construction of the stack and the windows while they were in progress.    As plaintiff's president did not know his rights when he protested, and was told by a good lawyer that he had no rights, he was influenced to some extent against taking prompt action and should not be estopped; especially as his conduct had no effect in inducing action by the other parties.    And this is the more true because the degree of annoyance and mischief which the stack would produce could not be realized in advance.

Ackerman v. True, supra, was a case to have the swell fronts of six buildings removed because they overhung the building line, contrary to a covenant in a deed. The defense of acquiescence was interposed and the court said:

"Acquiescence in an act, sufficient in law to create an estoppel, implies full knowledge, as well as the legal effect of the act, acquiesced in; and where the facts are known to both parties, or where both parties have the same means of ascertaining the truth, in the absence of fraud or bad faith, there can be no estoppel.    Nor can there be an estoppel unless something is done or omitted to be done which has the effect of misleading the opposite party, or inducing him to act in a different way than he otherwise would.    Here there is no claim made that the defendant located a portion of his buildings in the public street by reason of any act of the plaintiff, or that the plaintiff, by any act either of omission or

commission, misled him in any respect.   How, then, can
it be claimed, if these structures do deprive her of her
property rights, that she is estopped from asserting
them because she did not, prior to the erection of the
buildings, apply to the court to restrain the defendant
from doing what he had no legal right to do? One
can not be deprived in law of his property in this way.
There was no obligation resting on her to interfere with
the defendant unless she knew what rights of her own
were by his acts being interfered with, and he was mis-
led by reason of her non-interference, to his injury.
There is no such proof.   Nor can the fact that she re-
mained silent, in the absence of such knowledge, operate
as an estoppel to assert her rights, inasmuch as she was
at the time in possession of her lot, and that possession
was sufficient notice that he could not, without her con-
sent, deprive her of any interest therein.''

In Ode v. Manhattan Ry. Co., 56 Hun. 199, acqui-
escence in the construction of an elevated railway in
front of the plaintiff's premises, was pleaded to defeat
his action for damages, but failed because, from the
state of the decisions on the subject in New York, the
plaintiff was uncertain what his rights were.

Many authorities of the same kind might be quoted
from; and in fact most of the cases we have cited in
which it was sought to compel the removal of structures,
dealt with the defense of estoppel and acquiescence and
disposed of it on the grounds stated in the above excerpt
from Ackerman v. True.

In Perkins v. Turnpike Co., supra, the point was
raised that the complainant did not take active meas-
ures to stop the building of the toll house; but it was
held the evidence showed the turnpike company in-
tended to erect the house without asking plaintiff's con-
sent, and his failure to take measures to prevent it had
no influence on their action.

In Lux v. Haggin, 69 Cal., the question of acquies-
cence was gone into exhaustively, as large sums of

money had been expended by the defendants and would be lost to them if the complainants succeeded. It was decided that failure to institute the action sooner was no bar because it did not appear that the complainants realized the extent of the injury they would suffer.

It has been said that the rule by which a claimant of property who sees another lay out money on it without giving him notice, is barred from recovery "does not apply to an act of encroachment on land, the title to which was equally well known and equally open to both parties." Schaidt v. Blaul, supra; Casey v. Inles, 1 Gill, 502.

In truth, in this case persistent warnings were given to the Kennett Estate while its building was in progress. Bell conversed with its officers time and again in terms of protest; stated his objections, shook his head at the unlawful structures and manifested displeasure at their position in the alley. The testimony of Shepley and Kennett is conclusive that they took his objections into consideration, weighed them, and decided adversely to them; hence, they have no ground for now contending that their action was induced by Bell's conduct, or that his conduct was not energetic enough. Their course falls within the rule laid down in Atty.-Gen. v. Algonquin Club, supra, that if a defendant proceeds deliberately in the face of remonstrance to erect unlawful projections, he is not in a position to resist their removal.

"The Commonwealth did all that was reasonably necessary to put the defendant upon its guard, and to preserve the right to object to any unauthorized projections. The course pursued by the defendant in the erection of its club-house was taken deliberately, and under no reasonable misapprehension as to the position or views of the officers of the Commonwealth. It was not necessary to bring the information before the wall was finished. Linzee v. Mixer, 101 Mass. 512; Atty.-General v. Gardner, 117 Mass. 492."

Some Missouri decisions are cited by the defendants, but not one of them, so far as we recall, treats of the violation of a covenanted right and the doctrine of laches and acquiescence in connnection therewith.

In Rankin v. Charless, 19 Mo. 490, the case was one of nuisance caused by inserting the joists of defendant's building into the contiguous wall of the plaintiff's building. The opinion states that the record was barren of all the circumstances of the transaction, contained only the pleadings and verdict and that whether it would be more equitable to let the nuisance remain and leave the plaintiff to his remedy at law, or tear down the defendant's house, the court could not say, as the necessary facts were not before it.

Planet Co. v. Railroad, 115 Mo. 613, went off on a demurrer to a petition to restrain a railroad company from running trains through a cut on plaintiff's property alleged to have been unlawfully made. It was not even averred that the plaintiff objected while the defendant was building the road, and the case was decided on the point of an adequate remedy at law.

In Sherlock v. Railroad, 142 Mo. 172, the injunction prayed was to restrain the company from operating cars over an alleyway, but on facts entirely different from those in the case at bar, and the injunction was granted.

In Bailey v. Culver, 84 Mo., supra, the defendant had built a house costing $155,000 over a portion of an alley which had been closed by order of the city, another alley more convenient to the plaintiff having been opened. The relief asked was injunction against the occupation of a public alley, but without proof of special damage to the plaintiff or any damage at all. The action was not one to prevent the continued violation of a contract. It was held that to grant the relief prayed would result in great loss to the defendant without any benefit to the plaintiff.

We have examined all the authorities submitted

for our consideration in the careful and instructive briefs of counsel for the defendants, and in our judgment they would not justify us in refusing the relief for which plaintiff prays; more particularly as its prayer is founded on the plain violation of its rights under a solemn instrument, resulting in great and continued damage. No more beneficial relief is administered by courts than restraining aggressions of this character nor any where the propriety of the relief is more obvious.

Of the cases from foreign forums called to our attention by defendant's counsel, the following considered the question of removing improvements erected on premises in contravention of covenants. Whitney v. Railroad, 11 Gray 359; Water Lot Co. v. Bucks, 5 Ga. 315; Starkie v. Richmond, 155 Mass. 188, and Ware v. Smith, 156 Mass. 186. Other cases cited relate to trespasses, nuisances, or acts done under a claim of prescriptive right, and bear remotely, if at all, on the propositions of law which arise on the facts before us.

The three Massachusetts cases in which the writ of injunction to restrain breaches of covenants was denied, contain proof of such gross laches as render them irrelevant; but they may be compared with the other cases from that State, cited above, in which covenants were protected, and the two lines of decisions will be found to elucidate the principles on which such relief is granted or refused.

In the Georgia case, which was determined when injunctions were more charily granted than they are now, it is stated that no injury had resulted, or was likely to result, to the complainant.

We have devoted much study to this case because it will result in considerable loss to the defendants, rather than on account of doubt about how it ought to be decided. To our minds it is clear that the smokestack and the oriel windows are unwarranted encroachments on the private alleyway; that the former is a flagrant nuisance and that the plaintiff has not been remiss

enough to forfeit its rights. The circuit court dealt leniently with the defendants in allowing the windows to remain and directing the removal of nothing but the smokestack, and its judgment is affirmed. *Bland, P. J.,* concurs; *Reyburn, J.,* having been of counsel does not sit.