## NORFOLK SOUTHERN R. CO. v. STRICKLIN et al.

(District Court, E. D. North Carolina. March 2, 1920.)

No. 76.

1. **Railroads** ⊚══134(8)—**Lessor not necessary party to lessee's suit to compel removal of structures from right of way.**

Where a railroad company leased its entire railroad, with all of its franchises, privileges, rights, and property, and complainant had acquired all rights under the lease, the lessor was not a necessary party to complainant's suit to restrain defendants from hindering complainant from using its right of way and to compel them to remove buildings, fences, and other structures therefrom.

2. **Courts** ⊚══343—**Proper party will not be made party, where it would oust jurisdiction.**

Under equity rule 39 (198 Fed. xxix, 115 C. C. A. xxix), though a railroad company which leased its road, franchises, etc., would be a proper party to a suit to compel the removal of obstructions from the right of way, it will not be made a party, where to do so would oust the jurisdiction of the federal court.

3. **Injunction** ⊚══114(3)—**Defendants erecting structures on railroad right of way may be joined in suit for mandatory injunction.**

In a suit to compel the removal of buildings and structures from land claimed to constitute part of a railroad's right of way and to enjoin an interference with its use of its right of way, defendants interfering with such use may be joined, though they do not own or claim the land on which they have erected buildings and other structures under a common source of title, have no common interest, and are not acting pursuant to a conspiracy, agreement, or common purpose.

4. **Courts** ⊚══328(3)—**In a suit to restrain condemnation of railroad right of way, value of property not test of jurisdiction.**

In a suit for a mandatory injunction to compel the removal of buildings and structures from land claimed to constitute part of a railroad's right of way, the value of the property is not the test of a federal court's jurisdiction, where the obstruction of the right of way will prevent the company from operating trains to and from a new depot, which will cause damage in excess of $3,000.

5. **Injunction** ⊚══114(3)—**Necessity of adjusting relief to varying conditions affecting different defendants no objection to jurisdiction.**

In a suit for a mandatory injunction to compel the removal of structures from a railroad right of way, the fact that it may be necessary that the decree be so molded as to meet the varying conditions of the property of different defendants does not oust the jurisdiction.

6. **Equity** ⊚══150(1)—**Bill for mandatory injunction against several defendants not multifarious.**

A bill for a mandatory injunction to compel the removal of structures from a railroad right of way interfering with the railroad's use thereof is not multifarious, though the different defendants do not claim under a common source of title, have no common interest, and are not acting pursuant to any conspiracy, agreement, or understanding.

7. **Equity** ⊚══150(1)—**Rule stated as to "multifariousness."**

No bill is multifarious that presents a common point of litigation, the decision of which will affect the whole subject-matter and settle the rights of all the parties, and it is not indispensable that all parties should have an interest in all the matters or be interested to the same extent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Multifariousness.]

---

⊚══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **Easements ☞61(2)—Injunction proper remedy for invasion of rights in easement.**

The remedy for the invasion of the right to use and enjoy an easement is by injunction.

9. **Railroads ☞69—Easement acquired by presumed grant of right of way.**

A railroad company acquired only an easement in the land on which it constructed its road under a provision of its charter (Laws N. C. 1852, c. 136, § 27) providing that, in the absence of any contract with the owner, it shall be presumed that the land on which the road may be constructed, for 100 feet on either side of the center of the road, has been granted to the company, unless the owner within two years applies for an assessment of the value of the land.

10. **Railroads ☞66—Company claiming grant by presumption has burden of proving absence of contract for right of way.**

Under a provision of railroad charter that, in the absence of a contract, a grant of 100 feet on each side of the center of the track shall be presumed, the burden rests on the company claiming such grant by presumption to show the entry and construction of its road without any contract with the owner, notwithstanding the general rule that a party need not prove a negative and the difficulty of proving the absence of a contract.

11. **Railroads ☞66—Evidence held to show absence of contract for right of way, so as to raise presumption of grant.**

Evidence *held* sufficient to show that a railroad was constructed through lands of an incorporated town without any contract with the town, so as to give rise under its charter to a presumption of a grant of 100 feet on each side of the center of its road.

12. **Evidence ☞147, 586(2)—Search of records held competent but not conclusive on question of absence of contract granting right of way.**

Though the testimony of the chief of the engineering department of a railroad that he had caused a thorough and complete search, under his supervision and direction, of the records of certain railroads and of the county where land was situated, and had made inquiry among persons who might have knowledge of records or contracts, but that he and those under his direction and supervision had not been able to find any deed or contract relating to the right of way through certain lands, was not sufficient in itself to show that no contract was executed, it was competent to be considered with other facts and circumstances on that issue.

13. **Railroads ☞68—Presumption of grant of right of way of maximum width is not overcome by evidence of reputation.**

A general reputation that a railroad company acquired 200 feet for its right of way outside a town and only 50 feet within the town could not repel or overcome the presumption of a grant of 100 feet on each side of the center of the track arising under its charter, in the absence of any contract with the landowner.

14. **Railroads ☞68—Statutory presumption of grant of right of way not limited by owner's use consistent with easement.**

As a railroad company, acquiring a right of way 200 feet wide by statutory presumed grant, acquires only the right to use so much as is necessary for railroad purposes, it cannot prevent the owner from erecting buildings or making any use of the land not interfering with the use of the easement, and its conduct in permitting such use does not affect or limit the presumption of a grant.

15. **Railroads ☞68—Right of way easement acquired, notwithstanding presence of dwelling, where owner acquiesced.**

Though a railroad charter prohibited the company from invading any dwelling house, yard, or burial ground of any individual without his consent, if the owner acquiesced in the entry and construction of the road, land might be subjected to the easement, notwithstanding the presence of dwellings thereon.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

16. **Railroads ⊜⟶69—Purchaser of town commons held to take subject to railroad right of way.**

Where the board of commissioners of a town passed an order to lay off into lots and sell land formerly constituting the town commons, and thereafter a railroad was constructed through the land, and the commissioners directed the intendant to confer with the railroad in relation to the price, appointed a committee to confer regarding ditches, embankments, and bridges, and directed an application for the appointment of a committee to assess damages, one thereafter purchasing from the town took title subject to the company's right of way.

17. **Railroads ⊜⟶69—Right of way easement under presumed grant limited to necessity for railroad purposes.**

The easement acquired by a railroad company under a provision of its charter creating a presumption of a grant, in the absence of any contract with the owners of the land, is restricted in its use to the necessity for railroad purposes.

18. **Adverse possession ⊜⟶85(4)—Railroads ⊜⟶82(1)—Railroad right of way not subject to bar nor presumption of abandonment by reason of landowner's occupation.**

Under the express provisions of Revisal N. C. 1905, § 388, a railroad company was not barred, and no presumption of abandonment or release of its right of way arose, by reason of the occupation or use thereof by the owner of the land.

19. **Railroads ⊜⟶73(1)—Obstructions of right of way will be enjoined, if legal remedy is inadequate.**

For interference with the enjoyment of a railroad company's easement in its right of way, an action of trespass may be brought, and, if such remedy is inadequate, equity will enjoin such interference and by mandatory injunction require the removal of obstructions.

20. **Injunction ⊜⟶23—Will be denied, if injury to defendant disproportionate to that of plaintiff.**

A mandatory injunction for the removal of obstructions from a railroad right of way will be denied, and plaintiff left to his remedy at law, if the removal of the erection will cause damage to defendant disproportionate to the injury to plaintiff.

21. **Injunction ⊜⟶46—Restraining continuing trespass or requiring restoration of property dependent on equities between the parties.**

In a suit to prevent a continuing trespass or permanent injury to real estate, the question whether plaintiff shall have a prohibitory injunction, or, if the work affecting the property has been completed, a mandatory injunction, requiring restoration of the estate to its former condition, depends on a consideration of the equities between the parties.

22. **Injunction ⊜⟶5—When mandatory injunction denied.**

A mandatory injunction will not be issued, when it will operate inequitably and oppressively, nor when there has been unreasonable delay by the party seeking it, nor when the injury complained of is not serious or substantial, and may.be reasonably compensated in damages, while to restore things as they were before the acts complained of would subject the other party to great inconvenience and loss.

23. **Injunction ⊜⟶189—Decree will be as moderate as is consistent with correction of mischief.**

A decree granting a mandatory injunction will be as moderate as is consistent with effectually correcting the mischief.

In Equity. Suit by the Norfolk Southern Railroad Company against Joseph Stricklin and others. Decree rendered in favor of complainant, and commissioners appointed.

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

W. B. Rodman, of Norfolk, Va., and Rouse & Rouse, of Kinston, N. C., for plaintiff.

George V. Cowper, of Kinston, N. C., and Manning & Kitchin, of Raleigh, N. C., for defendants.

CONNOR, District Judge. The Norfolk Southern Railroad Company is a Virginia corporation. Defendants are citizens of Kinston, Lenoir county, N. C.

The Atlantic & North Carolina Railroad Company was incorporated by an act of the General Assembly of North Carolina, ratified on the 27th day of December 1852 (Laws 1852, c. 136), with authority to lay out, construct and operate a line of railroad from Morehead City to Goldsboro, passing through the town of Kinston, N. C. The road was constructed, completed, and operated during the year 1858. By the twenty-third section of its charter the company was authorized—

"to purchase * * * and hold in fee, or, for a term of years, any lands * * * or hereditaments which may be necessary for said road, or the appurtenances therefor, or for the erection of depositories, storehouses, houses for the officers, servants, or agents of the company or for workshops or foundries to be used for the said company, * * * and for no other purposes whatever."

By the twenty-fifth section it was provided that—

"When any lands or right of way may be required by said company for the purpose of constructing its road, and for the want of agreement as to the value thereof, or from any other cause, the same cannot be purchased from the owner or owners, the same may be taken at a valuation to be made by five commissioners * * * to be appointed by any court of record having common-law jurisdiction, * * * and the lands or right of way so valued by the said commissioners shall vest in said company so long as the same shall be used for the purposes of said railroad, as soon as the valuation may be paid or * * * tendered. * * * That the right of condemnation, however granted, shall not authorize the said company to invade the dwelling house, yard or burial ground of any individual without his consent."

By the twenty-sixth section it was provided that the right of the company to condemn lands in the manner described by the act—

"shall extend to the condemning one hundred feet on each side of the main track of the road, measuring from the center of the same * * * and the company shall also have power to condemn and appropriate lands in like manner for the constructing and building depots, warehouses, buildings for servants * * * not exceeding two acres in any one lot or station."

By section 27 it was further enacted:

"That in the absence of any contract or contracts with said company in relation to lands through which said road or its branches may pass, signed by the owner thereof or by his agent, or any claimant or any persons in possession thereof, which may be confirmed by the owner thereof, it shall be presumed that the land upon which the said road or any of its branches may be constructed, together with a space of one hundred feet on each side of the center of said road, has been granted to the said company by the owners thereof and the said company shall have good right and title thereto, and shall hold and enjoy the same as long as the same shall be used for the purposes of said road and no longer, unless the person or persons owning the said land at the time that part of said road which may be on the said land was finished, or those claiming under him, her, or them, shall apply for an assessment of the value of said land as hereinbefore directed, within two years

next after that part of the said road was finished; and in case the said owner or owners, or those claiming under him, her or them, shall not apply within two years next after the said part was finished, he, she, or they shall forever be barred from recovering said lands, or having any assessment or compensation therefor."

The Atlantic & North Carolina Railroad Company, subsequent to the date of its charter, and its organization thereunder, entered upon the lands hereinafter described, for the purpose of constructing its road pursuant to the power and authority conferred upon. it by its charter, and during the year 1858 completed same and began operation thereof as a common carrier of persons and freight. Complainant alleges:

"That there was no contract or contracts with the railroad company and Walter Dunn, or any other owner or owners of any of said land lying between the southern line of Caswell street and the line of lot No. 151 and the extended line in relation to the land through which said railroad passes, owned by said Walter Dunn, or any other owner or owners, claimant or claimants, or any other person in possession thereof, limiting or in any wise modifying the width of said right of way, and under said statute, two years after the completion of said railroad through said land, it was presumed that the owner or owners thereof had granted the land upon which said railroad was constructed, together with a space of one hundred feet on each side of the center of said track to said Atlantic & North Carolina Railroad Company. * * * That more than two years have elapsed since the entry by the Atlantic & North Carolina Railroad Company upon said road, and that no application has been made for an assessment of the value of said land, or one hundred feet on each side of the said road, or if such assessment was made the value so assessed was paid. That the Atlantic & North Carolina Railroad Company is now the owner of said land subject to the rights of complainant, its lessee."

The road was operated by the Atlantic & North Carolina Railroad Company, under and in accordance with the provisions of its charter, until September 1, 1904, when it executed a lease to "the Howland Improvement Company" for a term of 91 years and 4 months "of its entire railroad, with all of its franchises, privilege rights and property." This lease was held valid by the Supreme Court of North Carolina. Hill v. Railroad Company, 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606. The lease was conveyed and assigned by the lessee, November 26, 1905, to the Norfolk & Southern Railway Company. This corporation conveyed and assigned the lease, together with its other property, by way of mortgage, to the Trust Company of America, July 1, 1908.

Pursuant to the terms and provisions of the mortgage deed, a suit in equity was instituted by said trust company for the foreclosure of said mortgage in the Circuit Court of the United States, in Virginia and North Carolina, and in accordance with decrees rendered in said cause the property, including the said lease, was sold and purchased by complainant, the Norfolk Southern Railroad Company, and deed duly executed therefor, by the commissioners appointed for that purpose. All of this will fully appear by reference to the deeds, conveyances, and other records filed herein.

At the time of the construction and completion of the road, the company established and constructed a passenger and freight depot in

the town of Kinston, to be used in its business and operations, and continued to use the same until April 14, 1915, when, upon application of sundry citizens of the town of Kinston, an order was passed by the North Carolina Corporation Commission, said commission being empowered by law to make said order, directing the Atlantic Coast Line Railroad and the Norfolk Southern Railroad Company, lessees of the Atlantic & North Carolina Railroad Company, to erect in the town of Kinston a union passenger station of such size and appearance and with such conveniences as would properly serve the traveling public at this point. By an order of the Corporation Commission, dated January 2, 1917, the location of said union passenger station was fixed at the Caswell street junction, in said town, and the complainant, with the Atlantic Coast Line Railroad Company, ordered to submit plans to said commission for such passenger station not later than February 1, 1917, or show cause why the penalty prescribed by the statute (section 1087, Revisal) should not be imposed. It was also ordered that the construction of said depot or passenger station should be commenced not later than March 1, 1917, and completed not later than June 1, 1917, or cause be shown why the penalty prescribed by the statute, $500 for each day failure to comply with the order continued, should not be imposed. Section 1087, Revisal. The location of the depot or station is indicated on the map filed, marked "A."

Pursuant to the orders of the commission, and with the concurrence of the citizens of Kinston, the two railroad companies, for the purpose of constructing the union depot or passenger station, acquired the tracts, or parcels of land, as indicated on said map, Exhibit A, and filed with said commission a plan showing the location, size, arrangements, etc. An order was later made directing changes in said plans, and further action was postponed by reason of the intervention of the war and the action of the national government regarding operation of the railroad. Copies of the several orders are in the record.

For the purpose of enabling it to comply with the orders of the commission and providing track and siding facilities rendered necessary to operate its trains and perform its duties to the public in connection with the new union or passenger depot, complainant filed this bill against defendants, in which it alleges, in addition to the facts and allegations hereinbefore recited:

"That, at the time said railroad was constructed and completed, the land lying along the line of said railroad and through which its main track passes as it runs northwestwardly from the southern line of Caswell street, at its intersection with East street to the back line of lot No. 151, and to a line which is an extension of said line of lot No. 151 in the town of Kinston, was owned by persons whose names are now unknown to complainant, except it is advised that so much of said land as lies east of the western line of East street was owned by Walter Dunn, and said line of railroad was constructed, completed, and put in operation through said land, during or about the year 1858, and said company had entered upon said land and begun the construction of said road prior to the year 1858."

That, by virtue of the charter, leases, assignments, deeds, and court proceedings, the Norfolk Southern Railroad Company is the owner of a leasehold estate in, and entitled to the peaceful possession of, all of the rights of way acquired by the Atlantic & North Carolina Railroad Company, and especially to that part of its track north of the southern line of Caswell street, extend-

ing to the back line of lot No. 151, as shown on the plan of the town of Kinston, and said line continued.

That, until recently, the business of the Atlantic & North Carolina Railroad Company and its lessees has not required the actual use of any part of its said right of way north of the southern line of Caswell street and extending to the back line of lot No. 151, except that part occupied by its track and roadbed, and under the laws of North Carolina the adjacent landowners are permitted to enter upon and occupy lands included within the bounds of the right of way, and put it to such uses as shall not interfere with the operation of the railroad, until such time as it shall become necessary for the company to use and occupy its right of way.

That defendants, and those under whom they claim, have, in the exercise of such right, erected dwelling houses and other buildings and structures upon said land, the right of way of complainant, and are now in actual possession thereof, occupying the same, and thereby hindering and preventing the use and occupation thereof by complainant for railroad purposes.

That, in order to comply with the orders of the Corporation Commission, in respect to the erection and use of the union passenger depot or station at the place designated, and furnish safe and sufficient accommodation to the traveling public and depot facilities, for the purpose of constructing side tracks and tram tracks to enable its train to enter and switching facilities for its passenger and freight trains, it has become necessary to lay and construct tracks, switches, and other facilities through, over, and upon that part of complainant's right of way above described, now occupied by defendants. That the use and occupation of said part of its right of way, by complainant, is essentially necessary, in order that it may perform its functions as a common carrier of freight and passengers, and have proper ingress and egress to and from said union depot and to and from said freight platforms, with its engines, trains, and cars.

That complainant has given notice to the defendants in ample time that the use of its right of way located as above was necessary for the purposes above set out, and has requested defendants to remove their houses, fences, and other structures from the right of way and land of complainant, but they have refused and still refuse to do so, and continue to use same and prevent complainant from occupying and using said land and right of way for the purpose hereinbefore set out.

That, unless defendants are enjoined and restrained from further hindering and preventing complainant from using and occupying its right of way above described and building tracks and switches thereon, it will be prevented from properly entering and leaving said union depot with its trains, engines, and cars, and be hindered in receiving and shipping freight and performing and obeying the aforesaid order of the North Carolina Corporation Commission.

That the value of the right to use and occupy its right of way for the purposes stated, which right is now being invaded, and the use thereof prevented, by defendants, is in excess of $3,000.

Complainant prays for a mandatory injunction commanding the defendants, and each of them, to remove the buildings, fences, and other structures from the lands claimed by it, and that said defendants be restrained and enjoined from obstructing said right of way, or in any way preventing complainant from the use and enjoyment thereof.

The defendants, answering the bill, admit many of the allegations, but deny: That no contract was entered into with the owners of the lands described in the bill, at the time the Atlantic & North Carolina Railroad Company entered upon said land and constructed and completed its road thereon and thereover. That the Atlantic & North Carolina Railroad Company acquired an easement on the lands described in the bill of 100 feet on each side of said road. That the Atlantic & North Carolina Railroad Company has acquired title to

said land or any easement whatever thereon. That the said 100 feet on each side of the road is necessary for the use of complainant. That the amount in controversy between complainant and either of the defendants is $3,000.

Defendants challenge the jurisdiction of the court and say that there is a misjoinder of parties defendant, and that the bill is multifarious. Defendants thus meet complainant at the threshhold of its suit, and for the several reasons set out, pray that the bill be dismissed. These objections must be disposed of before proceeding to consider the controverted allegations of fact. If either of them are valid, the bill must be dismissed.

[1, 2] It is suggested that the Atlantic & North Carolina Railroad Company is a necessary party. Assuming pro hac vice that the title to the right of way vested in the Atlantic & North Carolina Railroad Company, it is manifest that by the lease executed to the Howland Improvement Company, and the several conveyances and assignments recited, it was conveyed and assigned to complainant. Such easement as was acquired by the Atlantic & North Carolina Railroad Company is confined to the use of the land for railroad purposes, and this right, during the term fixed by the lease, can be exercised only by the lessee. It is the only corporation having the power, or upon which the duty is imposed, during the continuance of the lease, to operate the road and exercise the powers conferred upon the Atlantic & North Carolina Railroad Company. Complainant alleges that the discharge of this duty and the exercise of this right is interfered with and prevented by the defendants. The right to prevent such interference and protect the right of way acquired by a railroad company vests in its lessee. Earnhardt v. Southern Railroad Co., 157 N. C. 358, 366, 72 S. E. 1062. The Atlantic & North Carolina Railroad Company has no power to enter upon the right of way, or interfere with complainant lessee in the exercise of its right or discharge of its public duty under the charter and lease, and is therefore not a necessary party to this suit. While it might properly be made a party plaintiff, and be thereby bound by the final decree, it being manifest that to do so would oust the jurisdiction of the court, under the provision of equity rule 39 (198 Fed. xxix, 115 C. C. A. xxix), it will not be made a party. Hopkins, Fed. Eq. Rules (2d Ed.) 204.

The challenge to the jurisdiction of the court is based upon the allegation, made by defendants, that they do not own or claim the land upon which they have erected houses and other structures, under a common source of title, nor is it alleged that said defendants have any common interest, or have formed or are acting pursuant to any conspiracy, agreement, or common purpose; that the value of the alleged right of way over no one of defendant's lands in $3,000.

[3] Passing, for the present, the question of the value of the subject-matter of the controversy, the right of complainant to join the defendants in the bill must be disposed of. The case of Louisville & N. R. R. Co. v. Smith, 128 Fed. 1, 63 C. C. A. 1 (C. C. A. 5th Circuit), seems to be decisive of this question. The facts, in respect to the

joinder of parties who are alleged to interfere with and obstruct the use by a railroad company of its right of way, in a bill of this character, are on all fours with the instant case. The question raised by the demurrer, stated by Circuit Judge Shelby, is the same as that presented here. After adverting to Prof. Pomeroy's view that, in such cases, parties may be joined to prevent a multiplicity of suits, and the suggestion of some courts that he had unduly enlarged the rule, he says:

"But in this case we are not required to take either side in that controversy. Here the jurisdiction in equity, as we have seen, is not dependent alone on preventing a multiplicity of suits. There are other and distinct grounds for equitable interference. The complainant seeks by injunction to prevent an obstruction to and interference with its right of way under circumstances, as we have shown, that confer equity jurisdiction from the inherent nature of the case, aside from the fact that the interposition of the equity court may prevent a multiplicity of suits. As to the alleged misjoinder of the defendants, the question here is: When may defendants be joined in a suit by a complainant, the bill stating other grounds for equitable interference, and not depending for its equity on the doctrine of preventing a multiplicity of suits? The rule, we think, is plain that where the matter in litigation is entire in itself, and does not consist of separate things having no connection with one another, it is not necessary that each defendant should have an interest in the suit coextensive with the claim set up by the bill. He may have an interest in a part of the matter in litigation, instead of the whole. There can be no reason why one complainant, who has the same right against a number of persons—that right being such that it confers equity jurisdiction— may not have that right determined as to all the parties interested by one suit. The plaintiff's claim is an entirety. It is a suit to protect a single indivisible right of way. The right claimed is exactly the same against each one of the defendants. All of the defendants are interfering in the same manner with the same right of way. * * * It is no objection that the several defendants each have a right to make a separate defense against the claim of the complainant, provided the complainant's assertion of right is the same against each, and there is only one general question to be settled, which pervades the whole case. It is enough if the purpose of the bill is to establish a single right between the complainant and the several defendants."

Prof. Pomeroy discusses the several classes of cases in which several defendants may be joined in one suit. Pomeroy's Eq. vol. 1, § 274 (3d. Ed.). The decision of Judge Munger in Union Pac. R. R. v. Cunningham (C. C.) 173 Fed. 90, is, as said by him, clearly distinguished from this case.

[4] If defendants may be joined, the question arises whether the value of the subject-matter of the suit is $3,000 or more. Upon the affidavits filed regarding the value of the property included in the alleged right of way, and the use to which complainant desires to put it, it is clear that it exceeds $3,000. I am of the opinion, however, that such is not the correct test for ascertaining and limiting the jurisdiction of the court in that respect. This question was also raised and discussed upon the same contention, in Louisville & N. R. R. Co. v. Smith, supra. Judge Shelby says:

"The bill in this case does not assert distinct claims against several persons, and seek to aggregate them to make up the jurisdictional amount; nor is it a suit to condemn or appropriate a right of way across defendants' lands. It is specifically alleged that the plaintiff many years ago 'acquired and now holds' the right of way as a perpetual easement. The property involved, and which the complainant seeks to protect, is the easement or right of way

acquired many years ago—the right to run its trains along its railway. The value of the thing involved in this suit cannot be ascertained by aggregating the value of the several strips of land covered by the right of way across the tracts owned by the defendants."

If, as it avers, and pro hac vice must be assumed as true, complainant, by reason of the obstruction of its right of way, is prevented from operating its trains when the new union depot is completed it will sustain damage far in excess of $3,000.

The principle upon which, in such cases, the jurisdiction in respect to the amount involved is fixed, is illustrated in Pacific Live Stock Co. v. Hanley (C. C.) 98 Fed. 327. The complaint sought, by suit in equity in the federal court, to restrain a number of persons from obstructing the flow of waters of a creek and overflowing the lands of complainant. Defendants demurred to the bill, assigning the same grounds upon which defendants herein rely. The court said:

"The rule against multifariousness forbids the complainant to unite in one bill several distinct demands against several defendants who have no common point of interest with each other. But if the cause of suit is entire in itself, and the relief sought does not consist in separate unconnected things, all the defendants connected therewith, and to be affected thereby, may be brought into one suit, and it is not necessary that the interest of each defendant shall extend to the whole subject-matter of litigation. * * * The point of common interest between the complainant and the defendants is the water of Silvies river. The right of the defendants to divert it is the question involved. The complainant asserts its right to the flow of the water as it was before the acts of the defendants had their inception. * * * The liability of the defendants, upon the facts stated in the bill, is not the sum total of a number of individual items, each of which is definitely calculable. The injury is single, and the proportion which each defendant contributes to it is not in the nature of things ascertainable."

After referring to decisions relied upon by defendants, he says that they are clearly distinguishable from the case in hand. In Bitterman v. L. & N. R. R. Co., 207 U. S. 205, 225, 28 Sup. Ct. 91, 98 (52 L. Ed. 171, 12 Ann. Cas. 693), wherein the company was seeking an injunction restraining ticket brokers or "scalpers" from dealing in railroad tickets it was said:

"The substantial character of the averment in the bill is to be tested, not by the mere immediate pecuniary damage resulting from the acts complained of, but by the value of the business to be protected and the rights of property which the complainant sought to have recognized and enforced." Board of Trade v. Cella Coms., 145 Fed. 28, 76 C. C. A. 28; Am. Smelting Co. v. Godfrey, 158 Fed. 225, 89 C. C. A. 139, 14 Ann. Cas. 8; Kindred v. Union Pac. R. R. Co., 168 Fed. 648, 94 C. C. A. 112; Glenwood Light Co. v. Mutual L. Co., 239 U. S. 121, 36 Sup. Ct. 30, 60 L. Ed. 174.

[5-7] The principle for which defendants contend would practically deprive one, whose right to enjoy and use an easement or right is of the character asserted by complainant, of the only efficient equitable remedy. If complainant is required to bring separate suits against each of the defendants, the expense and delay, to say nothing of the uncertainty of the result in each case, would render the right of but little value. It would be without any adequate means of preventing its invasion. It may be, if complainant maintains its alleged right, that in the final decree provision will be made to meet varying

conditions of the property of the several defendants. This is frequently done in suits in equity. The decree may be so moulded, that the right of all parties may be protected. That this may be necessary does not oust the jurisdiction. If there is not a misjoinder of parties defendant, and the subject-matter of the controversy or the value of the right asserted and denied is within the jurisdiction of the court, the bill cannot be said, in other respects, to be multifarious. While the subject is not reducible to definite rules, and to a large extent each case must be decided upon the peculiar conditions developed by the bill, a very safe rule is found in Street's Federal Equity Practice, vol. 1, § 405, in which it is laid down that—

"No bill is multifarious that presents a common point of litigation, the decision of which will affect the whole subject-matter and will settle the rights of all the parties to the suit; and it is not indispensable that all the parties should have an interest in all the matters contained in the suit, but it is sufficient if each party has an interest in some material matters involved in the suit, and they are connected with the others."

It is not necessary that they should all be interested to the same extent. Howe v. Haugan (C. C.) 140 Fed. 182. The motion to dismiss for the grounds set out, must be denied.

[8] It is well settled that the remedy for the invasion of the right to use and enjoy an easement is by injunction. This is not seriously controverted. In Seaboard Air Line R. R. Co. v. Olive, 142 N. C. 257, 55 S. C. 263, the remedy by injunction was sustained in an opinion quoting Beach, Mod. Eq. 670:

"The jurisdiction of a court of equity to protect a franchise from unlawful invasion or disturbance by injunction is clearly settled and has been recognized as benign and salutary. The ground of such jurisdiction is usually the prevention of irreparable injury, the avoidance of a multiplicity of suits and the abatement of annoyances in the nature of a legal nuisance. Another controlling reason for interference by equity in such cases is that the public at large have an interest in the protection of such a privilege as well as the party interested. And while the court will not interpose to prevent a mere trespass of an ordinary character, yet when a trespass or a series of trespasses will operate to destroy or seriously impair the exercise of a franchise, the apprehended injury will be enjoined."

In that case the situation presented, upon this bill, is anticipated and used as an illustration of the necessity for equitable relief:

"If one may obstruct the right of way of a railroad company and prevent it laying its tracks, or otherwise providing facilities for transportation of freight and passengers, and be responsible only to an action for damages, it would be impracticable for the Corporation Commission to enforce its orders providing for union depots, double tracks and other means necessary for the convenience and safety of the public. Injunctive relief against interference with the use of the right of way of a railroad company is not given because of any special consideration for these corporations, but because they are public agencies, chartered, organized and given the right of eminent domain, in contemplation of law, to serve the public. They are a part of the system of highways of the state."

The principle is announced, with citation of a wealth of authority, in Pomeroy's Equity, vol. 6, § 543 et seq.

[9] Assuming that the Atlantic & North Carolina Railroad Company made entry upon the land and constructed its road thereon as

alleged, it acquired, under the provisions of section 27 of its charter, only an easement to the extent not exceeding 100 feet on each side of the center of its track, as is well settled in this state. Construing the charter of complainant in this regard, in A. & N. C. R. R. Co. v. New Bern, 147 N. C. 165, 60 S. E. 925, the court said that its power to condemn or acquire land under the section referred to authorized it to acquire 100 feet on each side of its main track, as a right of way. So in Railroad v. Olive, supra, it was said:

"It is clear that, from any point of view which we may take of this case, the plaintiff acquired only an easement over defendants' lands," and that its only remedy was a mandatory or prohibitive injunction.

These decisions are in accord with a uniform line of decided cases in this state. Railroad Co. v. Sturgeon, 120 N. C. 225, 26 S. E. 779; Earnhardt v. Railroad, 157 N. C. 358, 72 S. E. 1062; A. C. L. R. R. Co. v. Bunting, 168 N. C. 579, 84 S. E. 1009. The extent of the limitation upon the use of the right of way, both as to distance and purpose will be discussed later.

We are thus brought to the consideration of the first and essential controverted question of fact. Complainant alleges that its lessor, the Atlantic & North Carolina Railroad Company, entered upon and constructed its road over the lands in controversy, in the absence of any contract with the owners or claimants or any other person, pursuant to the right to do so conferred by section 27 of its charter, as hereinbefore set out. Defendants admit the entry and construction of the road over the land by the Atlantic & North Carolina Railroad Company, but deny that it did so in the absence of any contract with the owners, and allege that John Stricklin, one of these owners of the lands, "made and executed a contract of conveyance of a right of way across the said land 25 feet on either side of the center of the main line of said track, and that the other owners of the said land, the defendants unknown, also executed a conveyance of a right of way of the same width to the Atlantic & North Carolina Railroad Company." No such deeds or contracts, nor any record or copies of such, are produced or introduced, nor is any parol evidence offered showing that any person has ever seen, or heard any other person say that they had seen, such contract.

[10] Defendants insist that the burden is upon complainant to show by satisfactory evidence the existence of the conditions by which its alleged right of way was acquired—entry and construction of the road in the "absence of any contract," etc. The presumption of a grant of the right of way is dependent upon these conditions. While it is true that, as a general rule, a party is not required to prove a negative, it is not accurate here to say that the complainant is called upon to prove a negative. It asserts title to an easement, acquired by a statutory presumption of a grant. The statute upon which it relies to sustain the presumption provides for the concurrence of certain clearly expressed conditions, upon which it raises or creates the presumption. The several sections of the charter prescribing the methods by which a railroad company may acquire a right of way over lands upon which it constructs its tracks must be construed

together. Here the statute prescribes three methods—by deed, by condemnation proceedings, or by entry and construction in the absence of a contract. The entry and construction "in the absence of a contract" raises the presumption—

"that the land upon which the said road or any of its branches may be constructed, together with a space of 100 feet on each side of the center of said road, has been granted to the said company by the owners."

The failure, for two years after the completion of the road, to apply to a court for an assessment of its value, relates to the claim for compensation. This is upon the theory that the presumption of the grant arises upon the entry and construction of the road, in the absence of a contract. While the absence of a contract is in form a negative averment—that is, the nonexistence of a contract signed by the owner—it is an essential averment, without which the presumption of a grant is not raised. The imposition, therefore, of the burden of proof upon the complainant of the absence of a contract is not based upon the rule that one who has or should have had in his possession the evidence upon which he bases his claim or title is required to produce it, but because the statute makes the absence of a contract the essential factor in the creation of the presumption of a grant. In such cases it is part of the complainant's burden to produce evidence to prove the negative proposition of fact, as that a certain event has not happened, that a fact did not exist, that a given person has not done a certain thing. Mere difficulty of making proof does not prevent the court from requiring of him that he show, as best he may, that a designated individual does not possess a certain thing. 2 Chamberlayne on Evidence, § 979. The rule is stated by Prof. Greenleaf, and quoted by Mr. Justice Matthews in Colorado Coal Co. v. United States, 123 U. S. 307, 319, 8 Sup. Ct. 131, 136 (31 L. Ed. 182), in which he says:

"To this general rule that the burden of proof is on the party holding the affirmative there are some exceptions, in which the proposition, though negative in its terms, must be proved by the party who states it. One class of these exceptions will be found to include those cases in which the plaintiff grounds his right of action upon a negative allegation, and where, of course, this negative is an essential element in his case." 1 Greenleaf, Ev. 78.

The rule is not affected by the fact that proof of the nonexistence of a contract, 60 years after the entry, is difficult. If defendants were required to prove the existence of such a contract, they would be met by the same difficulty. In the absence of any proof of the allegation made by the complainant in regard to the absence of a contract, it would simply fail to sustain the allegation upon which its claim to the easement depended. It has been held that—

"The degree of proof of a negative allegation is seldom measured by that required of an affirmative allegation. In some cases a negative may be positively and conclusively proved; * * * but in many cases this is impossible, and hence the amount of proof required to support the negative proposition and to shift the burden will vary according to the circumstances of the case. * * * Frequently all that is practically possible, in the absence of direct evidence, is the introduction of testimony establishing some particular fact inconsistent with the converse, affirmative proposition." 2 Chamberlayne, Evidence, § 981.

The burden imposed upon the complainant in this case is not met, so as to shift it upon defendants, by making a prima facie case; it carries the burden throughout the trial to show by a preponderance of the evidence that its lessor entered upon the land and constructed the road in the absence of a contract with the owner. Complainant relies upon what is said by Mr. Justice Brown, in A. & N. C. R. R. v. New Bern, 147 N. C. 165, 60 S. E. 925, that upon its being made to appear that the road was constructed in 1858, and that its main line was constructed practically where it now is, "the law presumes that the road has acquired the right of way which it was authorized to acquire by its charter, to wit, 100 feet on each side of its main line." The learned justice says:

"This is not left to conjecture, for section 27 of the charter * * * expressly so provides."

That case presented a controversy with the taxing power of the city, in which the company claimed that an erroneous method of assessing its property was being used. The question presented here did not arise. The learned justice overlooked, because there it was unimportant, that the presumption arose upon the language of section 27 only when the entry was "in the absence of any contract." The language used there, in that respect, is obiter.

The writer, in Barker v. Railroad, 137 N. C. 214, 49 S. E. 116, overlooked what he now regards the distinction between a presumption arising upon possession only and one arising upon entry and construction in the absence of a contract required by the statute. I do not think that these two decisions constitute a construction of the statute, in respect to the burden of proof, which is binding upon the federal court. The question has been considered and decided by the Supreme Court of South Carolina upon a statute in which the same language is found, in A. C. L. R. R. Co. v. Dawes, 103 S. C. 507, 88 S. E. 286, and Carolina & N. W. R. R. Co. v. Ford, 105 S. C. 80, 89 S. E. 809. These cases were followed, not only as controlling authorities, but with the approval of the construction of the statute, by the Circuit Court of Appeals of this circuit in Southern Ry. Co. v. Board of Coms., 246 Fed. 383, 158 C. C. A. 447. In all of these cases the question as to the burden of proof was presented. I concur in the reasoning of these courts and the conclusion reached by them.

[11] The town of Kinston was incorporated by act of the General Assembly enacted at the session of 1762, in which it recited that—

"It has been represented to the Assembly that the lands of William Heritage, lying on the North side of Neuse River, at a place called Adkins Banks, in Dobbs County, is a pleasant and healthy situation and commodious for trade and commerce, and the said William Heritage having acknowledged his free consent to have one hundred acres of the said land laid off for a town and fifty acres for a town Commons, which will greatly promote a trade of the said river, a town is established on said land to be called Kingston." Directors and trustees for said town are named, in whom "shall be vested an indefeasible estate in fee of the said one hundred and fifty acres for the uses set forth—to cause a plan of the town to be made and insert or mark a number to each lot and when this is done to take subscription therefor and appoint a day for the drawing of said lots which shall be done by ballot in open

manner, etc., and convey to each person drawing lots a deed therefor in half acres." Laws 1762, c. 13; 25 State Records, 468.

By the Laws of 1784, c. 46, it appears that the land allotted for the town had been divided into lots. By section 6 "one-half of the lot comprehending the southern part thereof, known in the plat of the town by the number Seventy-Six" is set apart for a gaol for the use of the county. 24 State Records, 613.

It appears that in 1858, when the Atlantic & North Carolina Railroad was built, the eastern limit of the town was marked by East street, and the western limit by West street. The General Assembly, at its session of 1848–49 (chapter 226), enacted a charter for the town of Kinston, the seventh section of which recites that—

"Whereas, several persons in said town, from ignorance of its limits and the exact course of the streets, have partially encroached on the commons * * * by the erection of buildings thereon; and whereas it would prove injurious rather than beneficial to said town to compel said persons to remove their buildings from said commons"—the commissioners are authorized to sell to such persons who have erected buildings on the commons or on the streets, the ground on which such buildings have been erected, and apply the proceeds to the improvement of the town.

The limits of the town are fixed by this act "as being that land which has been laid off into lots and which the town might buy from adjacent owners." On February 16, 1850, the governing board of the town of Kinston adopted the following resolution:

"That all that portion of the town commons which lies to the north of King street and between the present limits of the corporation on the west, the lands of Mr. John C. Washington on the north and the lands of Mr. Walter Dunn, Jr., on the east, shall be laid off into two and a half squares. After allowing streets of the usual width around the same on the north, west and east sides thereof and the present streets of the town running east and west to extend through the same and that each square shall be laid off and divided into eight lots, each lot of regular and equal size, the length of which shall run north and south and the width from east to west, to be numbered as the board may direct. * * * See plan of town."

On November 20, 1858, the records of the governing board show that an order was passed directing the secretary to expose to public sale on the following Saturday, at the courthouse door, "the two town lots known in the plan of the town as lots No. 155 and 156," and advertise accordingly. On December 4, 1858, the following order was passed:

"H. R. Strong reported that according to previous notice he had exposed to public sale the two lots No. 155 and 156 and that Dr. Woodley became the purchaser at the price of one hundred dollars—it is ordered that the sale be confirmed and that title be made to the purchaser."

See affidavit of W. B. Coleman, city clerk, Exhibit 14.

These two lots were conveyed to Dr. Thomas Woodley and record made of the receipt of purchase money. These lots constituted, prior to their sale, a part of the town commons. They are now owned and occupied by defendants Carl W. Hartsfield, Mrs. Laura E. Grady, and Mrs. Kate M. Cobb on the south side, and by defendant J. T. Skinner on the north side, of the railroad, who claim under Dr. Thomas Woodley.

The land east of East street, upon which defendant Stricklin lives, was not a part of the commons. The evidence indicates that in 1858, when the road was constructed, it was a part of a field. The Atlantic & North Carolina Railroad Company acquired title to the lands and right of way, through the town, west of the line of lot No. 151:

(1) By deed executed by John C. Washington, April 16, 1860, for that portion lying east of West street (on the west end) for 30 feet on each side of the center of the track, except where the depot was located, where it extends to 75 feet. Recorded April 16, 1860.

(2) Isiah Woods and William Fields, March 18, 1807, for the land lying east of the land conveyed by John C. Washington, 35½ feet from center of track. Recorded May 3, 1895.

(3) John Stricklin, April 15, 1858, for 25 feet on either side of center of track. The land is described as "being on Gordon street and known as lot 151 in the plan of the town of Kinston." Registered May 25, 1895.

These deeds cover the right of way of the Atlantic & North Carolina Railroad Company on the west, or Goldsboro, side, to the eastern line of lot 151. The controversy, therefore, is narrowed to the claim of complainant that its lessor, the Atlantic & North Carolina Railroad Company, acquired a right of way, in the manner set out in its bill, to that portion of the town lying between lot No. 151 and East street and the land lying east of East street, owned and occupied by defendant Joseph Stricklin, of 100 feet on each side of the center of its track. This includes lots Nos. 149, 150, 154, 155, and 156.

To sustain its allegation, in that respect, complainant introduced the affidavit of F. L. Nicholson, chief of the engineering department of the Norfolk Southern Railroad Company, in which he swears that—

"It became his duty and that he has caused a thorough and complete search to be made, under his supervision and direction, of the records and deeds, contracts, and other conveyances, through and under which the said Norfolk Southern Railroad Company owns and claims title to its right of way along its several lines of railroad. * * * That a thorough search of all records relating to the rights of way of the Atlantic & North Carolina Railroad Company from Goldsboro to Morehead City has been made under his direction and supervision, as well as a careful search of the records of Lenoir county, in which the land described is situate. A careful and thorough search also has been made of the old records and evidences of titles of the Atlantic & North Carolina Railroad Company, now on file for careful preservation in the custodian's office of the Norfolk Southern Railroad Company, and he has caused diligent inquiry to be made of and among persons who might have knowledge of any records or contracts, whenever the same might be found, relating to the right of way described in the complaint. That upon such careful and diligent search and inquiry he and those under his direction and supervision have not been able to find any deed, contract, agreement, or other paper writing granting, restricting, defining, or otherwise relating to the right of way of the said Atlantic & North Carolina Railroad Company, described in the complaint in this cause in the town of Kinston, between the southern line of Caswell street and the back line of lot 151 in said town."

He further says:

That the red lines on the map filed with his affidavit "show the portion of the land in the town of Kinston claimed by complainant. * * * That from

264 F.—36

the western line of the land so shown in red the line of railroad and rights of way of said railroad company extend in a general westerly direction through and beyond the town of Kinston, and that said right of way, extending from the aforesaid red lines on said map westwardly, varies in width from 50 feet to 105 feet as defined and limited in certain conveyances."

Affiant further says that for the rights of way west of the rights of way so conveyed by Washington, being west of the western boundary of the town, he nor those who, under his supervision, made search, have found any contracts, conveyances, or other paper writing in regard to such rights of way.

In further support of the contention that no contracts nor conveyances were made for the right of way through that portion of the town of Kinston east of lot No. 151, complainant shows that the courthouse, containing the record of deeds and conveyances for lands and rights therein, was, during the year 1879 or 1880, burned, and all of said records, except a book containing an index of deeds, were destroyed. Reference to this index book discloses the registration of the deeds for rights of way from Woods and Fields and Stricklin and Washington, but no other deeds to the Atlantic & North Carolina Railroad Company for rights of way through the town of Kinston appear on said index.

The records of the governing board of Kinston disclose:

That on April 4, 1857, an order was passed authorizing "the intendant to confer with the railroad authorities in relation to the lot taken up by the said railroad, and to fix with them upon a fair price to be paid to the town for the damage done to said lots by the said railroad." That on January 23, 1858, certain citizens were appointed a committee to confer with the contractors and engineers of the railroad, to "cause them to fill up all the ditches, to make all necessary embankments and suitable bridges on all streets and sidewalks of the town where the said road shall cross the same."

It was, at said time, also:

"Ordered that Henry R. Strong be a committee to obtain from the county court the appointment of a committee to determine and assess the damages done to lots 55 [155] and 56 [156] crossed by said railroad, and cause the amount assessed to be collected for the use of the town."

The town record does not show any action or any report by H. R. Strong pursuant to the said order, nor does it show that a deed was executed to the railroad company or contract made with it.

Defendants insist that the affidavit of F. L. Nicholson regarding the manner and extent of search made for a contract, deed, or conveyance for a right of way does not conform to the requirements of the law to admit secondary evidence of its contents. While such is not the purpose of the affidavit, but rather to lay the basis for the inference that no such paper was ever in existence, it is somewhat analogous, and reference to the rules governing secondary evidence of an alleged lost paper may be appropriately made. If such a paper was executed, it should be in the possession of either the officers or agents of the Atlantic & North Carolina Railroad Company, or the complainant.

It may be conceded that, if the execution of the contract, and therefore its existence at one time, had been shown or conceded, and, up-

on the allegation that it had been lost, mislaid, or destroyed, in the absence of any other evidence than that of Nicholson, a court would require a more specific statement of the manner, method, and agencies used in making the search. The rule usually followed by the judge, to whom the decision of the question is committed, requires that the witness state facts—where, when, and how search was made for the paper—so that he may draw the legal inference or conclusion whether it measures up to the standard required. It would have been more satisfactory if Nicholson had stated where and who, "under his direction and supervision," made such search. While not required to do so, defendants were entitled, and upon request would have been accorded opportunity, to cross-examine Nicholson. The case was submitted largely upon affidavits without objection. The rule usually followed by the courts is very well stated by Chamberlayne:

"Where a document, the contents of which a party desires to prove, would ordinarily be in a certain place of deposit, or in the custody of a certain individual, a presumption arises that it is in that place of custody, in the absence of evidence to the contrary. * * * Evidence, therefore, to prove the loss or destruction of a writing must, in order to authorize the relaxation of the rule respecting the production of the original, show that reasonable diligence has been used in searching for the original document. A mere casual, indifferent, or careless search will not be sufficient. Something more will be required; something tending to show that the proponent was actuated by a desire to find the alleged lost or destroyed instrument, and that his efforts were exerted bona fide to accomplish that result. * * * In other words, it should appear that he has exercised the same degree of diligence in his search for it that an ordinary person, actually desirous of finding and producing it, would have employed, which would require his looking for it in those places where one might fairly have expected to find it in the exercise by him generally of all reasonable endeavors to find it." Evidence, vol. 5, 2579.

[12] While it would not be safe to find, upon Nicholson's affidavit alone, unsupported by other facts and circumstances persuasive of the allegation, that no contract was executed, it is competent to be considered, with other facts and circumstances, and given such probative force as, upon all of the evidence upon the issue, it is entitled. I have no difficulty in finding that he is a credible witness and has testified truthfully; the sole question is whether he made so thorough and diligent search as the law requires, to make his evidence a reliable basis upon which to find the conclusion that no contract was executed. The fact that, in the absence of the book containing the recorded deeds and contracts, the "Index Book," the only part of the record saved from the fire and available, shows that such contracts or deeds as the complainant alleges the Atlantic & North Carolina Railroad made or received were recorded, and does not show that any other contract with the town of Kinston, or whoever may have been, at that time, the owners of the land in controversy, was recorded, is consistent with the failure of Nicholson to find the original of such contracts. The two facts are persuasive evidence of the nonexistence of such contracts. The records of the town of Kinston show that the land lying east of the line of lot No. 151 was a part of the town commons so late as 1850.

The last sentence of the ordinance of February 16, 1850, refers to the lots to be laid off "as that portion of the town commons," and,

following a description of the parts to be laid off in eight lots, concludes:

"And the balance of the town commons to be laid off and numbered into 20 additional lots."

Lots Nos. 155 and 156 were sold to Dr. Thomas Woodley December 4, 1858. It appears that he was mayor of the town at that time. The resolution of April 4, 1857, directing the intendant to confer with the railroad authorities to fix a fair price for the damage done to the lot taken up by the said railroad, and on January 23, 1858, appointing a committee to confer with the contractors and engineers to fill up all the ditches, embankments, and bridges, on all streets and sidewalks, where the railroad shall cross the same, indicates clearly that the company had, before then, entered upon the "lot," and the order directing Henry R. Strong to obtain from the county court the appointment of a committee to determine and assess the damage to "lots Nos. 155 and 156 crossed by said railroad, and cause the amount assessed to be collected for the use of the town," shows clearly the existence of the conditions for which section 27 of the charter provided—"entry upon the land in the absence of a contract." The town authorities evidently understood the provisions of the charter, the respective rights of the company and the town, and were pursuing the course prescribed by section 27 to secure compensation. The bill alleges that the road was completed in 1858, and this is confirmed by the history of the company. The index book shows that a deed was executed to Dr. Woodley, but does not show its date.

W. B. Coleman, city clerk, testifies that a careful examination of the town records back to 1848 fails to disclose any evidence of the execution of a deed from the town to, or the execution of any contract with, the Atlantic & North Carolina Railroad Company, or the grant of any easement or license to use any portion of the streets of the town. Dr. Woodley took title to the lots with notice that the road had been constructed through them, and therefore subject to such right as the company acquired under the charter by such entry. It is also clear that the board of commissioners claimed the damages or compensation for the taking. The price paid indicates that the lots were of small value.

A careful consideration of the evidence and records of the governing board leads to the conclusion that the Atlantic & North Carolina Railroad Company entered upon lots Nos. 155 and 156 and constructed the road thereon, without, or in the absence of, any contract with the town or any other owner or claimant. In respect to lots Nos. 149, 150, and 154, the evidence, so far as applicable, in regard to lots Nos. 155 and 156, sustain the conclusion that the Atlantic & North Carolina Railroad Company entered upon and constructed its track through them during the year 1858, without any contract with the owners. There are no structures within the 100 feet claimed by complainant on lots Nos. 149 or 154, and only the rear end of defendant Curtis' house on lot No. 150. No deed from the town for either lot is shown.

In respect to the lot owned by defendant Joseph Stricklin, lying east of East street, the testimony shows that in 1858 it constituted a

portion of a field owned by Walter Dunn. No streets through this property were laid out prior to 1858. The search made by F. L. Nicholson of the records of the Atlantic & North Carolina Railroad Company and complainant, and of the index book saved from the destruction of the courthouse, fails to disclose any deed or contract from Walter Dunn or any other person for the land or right of way.

[13] Affidavits are filed by the complainant showing that there was a general reputation that rights of way were acquired by the Atlantic & North Carolina Railroad Company outside the town of 200 feet. Defendants file affidavits of old citizens that there was a general reputation that the company did not acquire or claim rights of way through the town of more than 50 feet. Both may be, and doubtless are, true, but neither can be invoked to repel or overcome the statutory presumption of a grant of 100 feet on each side of the track, if the entry was made and the road constructed over the land without any contract with the commissioners.

The question regarding the right of way acquired by railroad companies in this state, under provisions found in section 27 of the charter of the Atlantic & North Carolina Railroad Company first arose in Railroad v. McCaskill, 94 N. C. 746, in which it was said:

"The presumption of the conveyance arises from the company's act in taking possession and building the road, when in the absence of a contract the owner fails to take steps, for two years after it has been completed, for recovering compensation. It springs out of these concurring facts, and is independent of inferences which a jury may draw from them. If the grant issued, it would not be more effective in passing the owner's title and estate. Thus vesting, it remains in the company as long as the road is operated, of the specified width, unaffected by the ordinary rules in reference to repelling presumptions."

In Sturgeon's Case, 120 N. C. 225, 26 S. E. 779, it was held that the statute created the presumption of a grant, not of the land, but of an easement, to be used to its full extent, when and as the necessities of the company for railroad purposes required. In Barker v. Railroad, 137 N. C. 214, 49 S. E. 115, discussing a similar provision in the charter of defendant, after noting the concurring conditions upon which the presumption was created by the statute, it was said:

"The statute fixes the term of two years within which the owner may prosecute his action, and in default of which the road acquires the easement described, to wit, 'one hundred feet on each side of the center of the road,' with the limitation fixed as to time and use. * * * The boundary is fixed at 'one hundred feet on each side of the center of the road' and we have no right to restrict it."

In Parks v. Railroad, 143 N. C. 289, 55 S. E. 701, 12 L. R. A. (N. S.) 680, referring to the acquisition of a right of way by entry and construction, it is said that, where the owner acquiesces for two years—

"after the construction of the road over his land, with full knowledge of his legal rights and of the extent of the rights accruing to the company by such occupancy, he assents to the acquisition of the easement in the same manner and to the same extent as if the land had been condemned. We would find it exceedingly difficult, if not impracticable, to draw any line of distinction between the rights acquired by the different methods prescribed by the law."

The cases are reviewed by Mr. Justice Allen in Earnhardt v. Railroad, 157 N. C. 358, 72 S. E. 1062, and the same conclusion reached. In Earnhardt's Case, supra, Mr. Justice Allen says:

"The presumption does not arise except in the absence of a contract, and it may be that where permanent structures have been erected by the owner of the land, within 100 feet of the main line, and have been used for a long time without objection, and also in localities where it is customary to acquire rights of way by purchase less in width than 100 feet, that the presumption would not arise *when neither party introduces any evidence that there was no contract.*"

With all deference to the learned justice, he appears to overlook the distinction between those cases in which, from long and continued possession and use of land, the law raises a presumption of a grant, wherein conduct on his part, either active or passive, inconsistent with the presumption, may be invoked to rebut it, and the case in which the statute provides that upon certain fixed conditions the presumption of a grant is created.

[14] In the last instance, when the owner acquiesces in the action of the company in entering upon his land and completing the construction of its road, the statute creates the presumption that he has granted the easement in accordance with the limit and the purposes fixed by the charter. Institution of proceeding for compensation may be postponed for two years, after which he is barred, not only of a right to deny the grant, but also of a claim for compensation for the easement. As the company acquires only the right to appropriate and use so much of the land, upon which the easement to its full extent is imposed, as is necessary for railroad purposes, the owner may erect buildings upon it or subject the land to any other purpose he may desire, which does not interfere with the use of the easement, and the company may not object to, or prevent, him from doing so. Lumber Co. v. Hines, 126 N. C. 254, 35 S. E. 458; A. C. L. R. R. v. Bunting, 168 N. C. 579, 84 S. E. 1009, in which the cases are cited. How, then, can the presumption that in 1858 the owners of the lot granted to the Atlantic & North Carolina Railroad Company a right of way of 100 feet on each side of its track be affected or limited by the erection of buildings thereon, thereafter? When a party relies upon a presumption arising upon the possession during the time prescribed, he must show such possession during the entire period; hence conduct on his part, at any time *during such period,* inconsistent with such presumption, may be invoked to rebut it. Here the conditions, entry and construction of the road, upon which the presumption arises, are found to exist.

Again, it is said that the presumption may not arise when it is customary to acquire rights of way by purchase less in width than 100 feet. This condition may, with reason, be made the basis of contrary inference. The purchase from some landowners of a restricted right of way may be entirely consistent with the inference that the entry and construction of the road over the lands of other owners, without a conveyance or contract, was made in the exercise of its statutory right. It is said, however, that the presumption may not arise where neither party introduces evidence of the nonexistence of the contract.

It would seem that the learned justice had in mind the view that the burden of proof was on the landowner to show that there was no contract when the road was constructed, and in the absence of any evidence the presumption arose. Railroad Company v. New Bern, supra.

However this may be, here the complainant and defendants have both introduced evidence of the nonexistence of a contract; the burden being placed upon complainant and the fact found in accordance with its allegation. I am constrained to hold, in accordance with a uniform current of decisions of the Supreme Court of this state, in which the charter of this and other railroad companies containing the same language have been construed and dealt with, that unless prevented for other reasons, to be presently considered, the Atlantic & North Carolina Railroad Company acquired a right of way of 100 feet on each side of its track over and through the land described in the bill for railroad purposes. Railroad v. Olive, 142 N. C. 257, 55 S. E. 263.

Defendants say the Atlantic & North Carolina Railroad Company could not have acquired, by condemnation or presumption of a grant, a right of way over the lots in controversy, at the time the road was constructed, because of a provision in its charter forbidding "the company to invade the dwelling house, yard or burial ground of any individual without his consent." Section 25. As we have seen, all of the town lots in controversy at the time the road was constructed, were owned by the town of Kinston. While affidavits are filed by several persons of advanced age, stating the location of houses on several lots, it must be kept in mind that more than 60 years have elapsed since the construction of the road; that the sale of the lots by the town was being made while, and doubtless because of, its coming. It seems to be conceded that there was on the lot occupied by defendant Skinner a gin house, around which there was a fence. On the lot occupied by defendant Stricklin there was a small tenant house. On the lot occupied by Mrs. Stroud, No. 154, there was, 60 years ago, a dwelling. No part of her dwelling is involved in complainant's claim.

I have examined all of the affidavits filed by the parties and in the light of the town records and facts not in controversy I am constrained to conclude that the town had not, at the time the Atlantic & North Carolina Railroad Company entered upon the land in controversy, sold the lots; that there were, at that time, no dwellings upon them which prevented the condemnation of a right of way over them.

[15] If the owner acquiesces in the entry and construction of the road, the land may be subjected to the easement, notwithstanding the presence of dwellings thereon. The protective provision may be waived by the owner. The action of the governing board of the town clearly indicates that it acquiesced in the entry and construction of the road across the town commons.

[16] The defendants further insist that, as no authority is conferred by express words to the Atlantic & North Carolina Railroad Company to enter upon or condemn lands owned by a municipal corporation that no such authority was conferred by the general terms of the charter. Authorities are cited to sustain the proposition that, unless ex-

pressly granted, a railroad company, under its power to condemn land for its right of way, cannot condemn property owned and used by a municipal corporation for municipal purposes; that the power to condemn lands already devoted to a public use must be conferred by express terms, and will not be implied from the use of general words. 10 A. & E. Enc. 1093, 1094; C., M. & St. P. Ry. Co. v. Town of Lost Nation (D. C.) 237 Fed. 709.

The numerous cases found in the state and federal reports, in which conflicts between the exercise of the right of eminent domain by one public corporation over property held by another corporation have arisen, relate to efforts on the part of railroad companies to condemn rights of way over streets, or where one railroad company seeks to condemn a right of way over the property of another company. It is conceded that the Legislature has the power to confer such right. It is also held that it should be granted in express terms. The reason upon which the rule is based is thus stated in North Carolina & R. & D. R. Co. v. Carolina Cent. Ry. Co., 83 N. C. 489:

"We see no reason why land obtained under a legislative grant of the right of eminent domain should be exempt from its exercise when the public interest requires it for other public uses, any more than other lands held by individuals. The rights of property thus invaded are as sacred in the one case as the other, and equally protected in the fundamental law; and both are and must be subordinate to the demand of the state for public and useful purposes. The exercise of the power of eminent domain over the property of public corporations may be, however, subject to limitations not strictly applicable to other property. It is reasonable, as contended in the argument for the plaintiffs, that land of one such corporation, necessary for the exercise of its franchise and to the discharge of its duties, should not be taken and appropriated by another corporation no more important or useful, unless upon a clear expression of the legislative intent to confer it, and then the act itself would be a declaration that the condemnation was required for the public good." Springfield v. Railroad Co., 4 Cush. (Mass.) 63.

The power to condemn land granted in general terms to a railroad company will not permit it to locate its right of way through land held by a town for the purpose of building a reservoir (State v. Montclair R. R. Co., 35 N. J. Law, 328), or land held by a county for the purpose of building a courthouse or a public schoolhouse (B. & O. R. R. Co. v. North, 103 Ind. 486, 3 N. E. 144) or by a state for an institution for the blind (St. Louis R. R. Co. v. Trustees, 43 Ill. 303). In United States v. Chicago, 7 How. 185, 12 L. Ed. 660, it appears that the United States owned a tract of land on which at one time it maintained a fort. After the fort was abandoned, the Secretary of War by authority of an act of Congress laid off squares and streets, calling it "Ft. Dearborn addition to Chicago." A portion of the lots were sold; the government reserving the part on which the fort was situate, with the land immediately contiguous thereto. Sale was made only of the part outside the reservation. The city undertook to open the streets within the reservation, where no sales of land had been made, and where opening the streets would destroy some of the public buildings and materially injure and impair uses of the station. The United States applied for an injunction. The court enjoined the city. Mr.

Justice Woodbury, after stating the grounds upon which the right to enjoin the city from opening the streets was based, said:

"It is not questioned that land within a state, purchased by the United States as a mere proprietor, and not reserved or appropriated to any special purpose, may be liable to condemnation for streets or highways, like the land of other proprietors, under the rights of eminent domain. But that was not the condition of this quarter section, being a part of the land originally ceded to the United States as the Northwest Territory, and afterwards specially set apart * * * for military purposes. Here the opening of these streets would also injure, if not destroy, the great objects of the reservation."

It is sometimes difficult to draw the line between property held by a municipal corporation for public and for private purposes.

"Property of a municipal corporation, which is essentially public in its nature and is held in trust for the public by the corporation, and is necessary for the exercise of its proper municipal functions, cannot be sold to satisfy the debts of the corporation. But the mere private property of a municipality, held for purposes of income or sale, unconnected with any governmental use or function, may be levied on and sold to satisfy a judgment rendered against a municipal corporation." 20 A. & E. Enc. 1190.

In Klein v. New Orleans, 99 U. S. 149, 25 L. Ed. 430, it is said:

"The test in such cases is as to the necessity of the property for the due exercise of the functions of the municipality."

In Zehner v. Milner, 172 Ind. 493, 87 N. E. 209, 24 L. R. A. (N. S.) 383, it was held that a mill site which had been condemned for a public use had ceased to be used for such purpose, and was no longer operated for toll, but only for private use, was subject to condemnation for another public use. In the note it is said, and supported by many cited cases:

"It seems to be the universal rule that property, although previously condemned or purchased for a public use, but which never has been put to such use, or has ceased to be so used, is subject to condemnation, the same as property of a private individual."

This is in accordance with the rule of law that, when the reason upon which immunity from sale of property ceases, the immunity also ceases. It is manifest that, anticipating the coming of the railroad and extending the growth of the town, the charter of 1849 was enacted. The board of commissioners, in accordance with the provisions of the new charter, at once decided that the land which had been set apart as a commons was no longer necessary for that purpose, and passed the order for laying it off into lots and selling it. This was a declaration on the part of the town authorities that it was not necessary for municipal purposes. The road was completed and ready for operation June 17, 1858. On April 4, 1857, the board of commissioners directed the intendant to confer with the railroad authorities in relation to the lot taken up by said railroad and fix upon a fair price.

On January 23, 1858, a committee was appointed to confer with the contractors in regard to the ditches and make embankments and bridges, and on the same day Henry R. Strong was directed to obtain from the county court the appointment of a committee to assess the damages to lots 155 and 156, and to collect the same for the use of

the town. It is manifest, therefore, that when Dr. Woodley purchased these lots, December 4, 1858, the road had been completed, and he took title subject to such rights of way as the company had acquired by its charter. He gave $100 for the two lots.

Assuming that the company had acquired, by presumption of a grant, a right of way of 100 feet on each side of the center of its track, and that the town claimed the damages or compensation therefor, its failure to prosecute its proceeding for two years conferred a perfect title and barred it, or Dr. Woodley, from any claim for compensation.

[17] In this condition of the title to the lots and the right of way, it is settled by a uniform current of decisions in this state that the easement acquired by the railroad company was restricted in its use to the necessity for railroad purposes—that its right and power to prevent the owner or owners of the lots from using them was restricted to such necessity. In Blue v. Railroad Co., 117 N. C. 644, 23 S. E. 276, it was said:

"The right of way of railroad companies is by judgment of condemnation made subject to occupation where and only where the corporation finds it necessary to take actual possession in furtherance of the ends for which the company was created. The damages are not assessed upon the idea of a proposed actual dominion, occupation and perception of the profits of the whole right of way by the corporation; but the calculation is based upon the principle that possession and exclusive control will be asserted only over so much of the condemned territory as may be necessary for corporate purposes, such as additional tracks, ditches, and houses to be used for stations and section hands. Unless the land is needed for some such use, the occupation and cultivation by the owner of the servient tenement will be disturbed only when it becomes necessary for the company to enter in order to remove something which endangers the safety of its passengers, or which might, if undisturbed, subject the owner to liability for injury to adjacent lands or property."

This language is quoted with approval in Sturgeon's Case, 120 N. C. 225, 26 S. E. 779, where it was held that the company was not entitled to a judgment for possession of its right of way, unless it showed that such possession was necessary for its corporate purposes. In Shield's Case, 129 N. C. 1, 39 S. E. 582, it was said:

"It was never expected that the roads would claim the actual possession * * * of any more of said lands than were necessary for their operation and protection."

See Barker's Case, 137 N. C. 214, 49 S. E. 115; Olive's Case, 142 N. C. 257, 55 S. E. 263, in which the necessity for extending its use of its right of way was caused, as here, by an order requiring the companies to build and maintain a union depot.

In the latest case in which the question is discussed (Railroad v. Bunting, 168 N. C. 579, 84 S. E. 1009), the court, citing the foregoing and many other cases, refused to enjoin the defendant from constructing a brick building on the right of way of the company, because it did not appear that, at that time, the occupation and use of the land was necessary for the corporate purpose of the company. No proposition is more firmly settled and has been more uniformly enforced by the courts of this state than that first announced in Blue's Case, su-

pra. The following cases illustrate, not only the uniformity with which this doctrine has been adhered to and enforced, but the extent to which it has been applied: Lumber Co. v. Hines, 126 N. C. 254, 35 S. E. 458; Hendrix v. Railroad Co., 162 N. C. 9, 77 S. E. 1001; Coit v. Owenby-Wofford Co., 166 N. C. 136, 81 S. E. 1067. The conclusion is irresistible that the purchasers and present owners of these lots were fixed with notice, as matter of law, that neither the Atlantic & North Carolina Railroad nor its lessee could interfere with, or object to, such use of the land over which the right of way had been acquired, as they desired to make of them, until the necessity for its use by the company arose. \

[18] Has the Atlantic & North Carolina Railroad Company, or complainant, its lessee, by their manner of dealing with and using its right of way, or otherwise, lost or forfeited the right acquired under its charter, or is it by such use estopped from asserting, or have they lessened the extent of the right to use such easement when such necessity arose? The same contention made by defendants, in this respect, has been made and disposed of in several of the cases cited. In McCaskill's Case, 94 N. C. 746, and in Olive's Case, supra, the defendants, owners of the land upon which the right of way was located, had been in the occupancy thereof and erected buildings for many years, in one case 40 years. Revised Code, c. 65, § 23 (in effect in 1858). Revisal 1905, § 388, provides that—

"No railroad * * * company shall be barred of, or presumed to have conveyed, any real estate, right of way, easement, leasehold, or other interest in the soil which may have been condemned, or otherwise obtained for its use, as a right of way, * * * by any statute of limitation or by occupation of the same by any person whatever."

Neither the Atlantic & North Carolina Railroad Company nor its lessee was barred, nor did any presumption of abandonment or release of its right of way arise by reason of the occupation or use thereof by the owner of the land. The language of the statute is too clear to admit of controversy. Beattie v. Railroad, 108 N. C. 432, 12 S. E. 913. Statutes protecting not only railroad companies, but cities and towns, from the effect of long and permissive, or hostile, use, by abutting landowners and others, of streets, commons, lands covered by rights of way, or other easements upon their claims, title, or interests have been expressive of the policy of the state for many years. They have been uniformly enforced by the courts. Revisal, §§ 388, 389.

The facts disclosed by the record in this case lead to the conclusion that the Atlantic & North Carolina Railroad Company acquired by statutory presumption a grant during the year 1858 of a right of way over the land described in the bill of 100 feet on each side of its track, for railroad purposes, which it was entitled to use and enjoy whenever and to the extent it became necessary for the operation of its trains in the performance of its duties and obligations to the public as a common carrier; that this right of way, by the leases and assignments thereof set out in the bill, passed to and vested in the complainant; that the duty imposed upon complainant to erect and maintain the new union depot, as located by the Corporation Commission,

sustains the allegation that the use of at least a portion of such right of way is necessary to enable complainant to operate its trains by entering and passing out of the new depot and the erection and maintenance of side tracks and other structures.

We are thus brought to a consideration of the rights of complainant respecting the remedy to which it is entitled to enable it to use and enjoy its right of way. Consideration must also be given to the rights and duties of defendants in the enforcement of complainant's rights. The prayer is for a mandatory injunction, commanding defendants to remove the houses, fences, and other structures on the lots over which the right of way is imposed and which constitute obstructions to its use by complainant.

The evidence tends to show: That the dwelling houses situate on the right of way were built many years since. The land upon which defendant Mrs. Laura E. Grady resides includes her home, in which she has lived for 18 years, being the only property which she owns, the result of her labor for many years. "If taken from her without compensation in this proceeding, it will leave her without a home and practically without anything upon which to subsist." That other buildings on the right of way have been there for many years, the lots being used for residences as far back as she can remember. That the dwelling in which she lives is of the value, independent of the lot, of $3,500.

Mrs. Kate Cobb is a widow, with three children, working for a livelihood. Her home in controversy is her entire estate, representing the saving from the labor of her daughters and herself. If taken from her, she and they will be left without a home or property. She is 62 years of age; has known the property and the streets for 26 years; there have been buildings on the lots, as now, during this time. Her residence is of the value of $3,500, independent of the value of the land upon which it is located.

The value of the lots of Joseph Stricklin and J. T. Skinner is each $10,000. The value of the lot of R. L. Curtis is $4,000. The value of the lot of C. A. Hartsfield is $10,000, and the improvements $8,-000. The value of the lot of N. W. Jones is $10,000, and of Clyde Tyndall $1,500.

At the time the road was constructed through the town of Kinston the population did not exceed 500. It is now a prosperous and growing town of 10,000 population. The evidence of old citizens, whose memory enabled them to refer to conditions respecting the growth of the town and erection of buildings during the past half century, shows that there was, at all times, a general understanding and belief on the part of the citizens that the Atlantic & North Carolina Railroad Company did not own, or claim, any wider right of way through the eastern portion of the town than was granted to it by Col. John C. Washington and others through the western end, and that buildings, dwellings, and fences have been erected in accordance with this understanding and belief; that no claim or suggestion has been made, either by the Atlantic & North Carolina Railroad or its lessees, that any larger or wider right of way was owned or claimed, nor was any

objection ever made by said company or its lessees to the building of dwellings, fences, or other structures along said right of way within the distance of 100 feet from the roadbed; that during this period the roadbed and ditches have been constructed and kept open the same width as was used and occupied through the lands over which the company acquired rights of way by deed from Washington and others. These facts are established by a number of affidavits of credible, intelligent, and disinterested witnesses, residents of the town of Kinston at all times since the road was constructed. I have made personal examination of the streets and property within the portion of the town in which the property in controversy is located. The natural physical conditions sustain the evidence of defendant's witnesses.

These conditions are relevant only in dealing with the question of complainant's prayer for a mandatory injunction, commanding defendants to remove the buildings and other structures from the right of way. If this were an action of ejectment, or for the recovery of possession of the land covered by the right of way as in Railroad v. McCaskill, 94 N. C. 746, and same case, 98 N. C. 526, 4 S. E. 468, that case would be a controlling authority upon which defendants could successfully assert a claim under the North Carolina statute for betterments. Revisal 1905, § 652. In that case neither party was advertent to the authorities in other jurisdictions, there being none in North Carolina, that an action of ejectment could not be maintained to recover an easement:

"Ejectment is not maintainable for incorporeal hereditaments, which consist of rights and profits issuing out of, and annexed to, real property, such as rights of way, of common, etc. * * * The right to enjoy an easement cannot be vindicated in this action, because an easement lyeth in grant and not in livery. * * * The action cannot be sustained to recover, as an easement to a mill, the right to use a wharf along a canal basin for the purpose of loading and unloading boats carrying wheat to and from the mill of the claimant." Sedgwick & Wait, Trial Title to Land, § 146.

The most effectual remedy is by mandatory injunction, which will be granted to compel restoration of the claimant to the enjoyment of his right. Olive's Case, supra.

[19] In accordance with the well-settled line of authority, the relief demanded here is injunctive. For interference with the enjoyment of an easement, an action at law, as for trespass, may be brought, in which the plaintiff recovers damages for the injury sustained, or if, for any of the reasons recognized by the courts, the remedy at law is inadequate, equity will enjoin the interference in the future, and by mandatory injunction require the wrongdoer to remove such obstructions as he has erected to the enjoyment by the complainant of his rights. The result of English and American authorities is stated in Jones on Easements, § 889:

"A mandatory injunction will issue for removal of obstructions to rights of way, or to other rights appurtenant to land. But the court will not, in every case of a permanent obstruction to the use of an easement, restore the aggrieved party to his former situation."

[20, 21] A mandatory injunction, for the removal of an obstruction of the work which has been done, may be had if the defendant has

gone on after notice and without right in willful invasion of the plaintiff's rights, unless the removal of the erection would cause a damage to the defendant disproportionate to the injury to the plaintiff, in which case the court will leave the plaintiff to his remedy at law. When plaintiff brings a bill to prevent a continuing trespass or a permanent injury to his real estate, the question whether he shall have a prohibitory injunction, or, if the work affecting the property has been completed, a mandatory injunction requiring the restoration of the estate to its former condition, depends upon a consideration of the equities between the parties. Krehe v. Burwell, 7 Ch. D. 551, 47 L. J. Ch. 350, 10 Eng. Ruling Cases, 307; Beach on Injunction, §§ 97–104; City of Eau Claire v. Matzke, 86 Wis. 291, 56 N. W. 874, 39 Am. St. Rep. 900.

In Smith v. Smith (1875) 20 L. R. 500, Sir George Jessell, M. R., discussing cases in which the court will grant a mandatory injunction, says:

"Without laying down any absolute rule, in the first case, it is of great importance to see if defendant knew he was doing wrong and was taking his chances about being disturbed in doing it. The next point for consideration is the materiality of the injury to the plaintiff—but that alone was not sufficient; all the circumstances must be taken into consideration, not only the injury to the plaintiff, but also the amount which has been laid out by the defendant."

American decisions are in harmony with the rule laid down by the learned Master of the Rolls. 12 Standard Enc. of Procedure, 998 et seq.

In Boyd v. Woolwine, 40 W. Va. 282, 21 S. E. 1020, a mandatory injunction was granted, commanding defendant to remove obstructions from a private way. Judge Holt said that if the right was established—

"no question is made that this is their proper remedy; in fact, their only plain, adequate, and complete remedy, seeing that it is the unobstructed use of the road they are after, and not damages for the obstruction of it."

See Hershman v. Stafford, 58 W. Va. 459, 52 S. E. 533; Bernei v. Sappington, 102 Md. 185, 62 Atl. 365.

"A mandatory injunction is never granted unless very serious damage will ensue from withholding relief, and each case must, of course, depend upon its own circumstances." 3 Street's Fed. Eq. Prac. § 2289; Darrell v. Pritchard (1865) L. R. 1 Ch. 244; Great North of England R. Co. v. Clarence R. Co. (1844) 1 Coll. Ch. Cases, 507; Westminster Brymbo Co. v. Clayton (1866) 36 L. J. Ch. N. S. 476.

[22, 23] It is for the court, in the exercise of a sound discretion, to determine in such instances whether a mandatory injunction will issue. It will not be issued when it appears that it will operate inequitably and oppressively, nor when it appears that there has been unreasonable delay by the party seeking it in the enforcement of his rights, nor when the injury complained of is not serious or substantial, and may be reasonably compensated in damages, while to restore things as they were before the acts complained of would subject the other party to great inconvenience and loss. If the court grants equitable relief, the decree will be as moderate as is consistent with effectually

correcting the mischief. Courts are lenient in litigation of this character, and decline to compel alterations of permanent improvements further than is necessary to relieve a complainant from annoyance and loss. 7 Standard Enc. of Procedure, 959, 960; Starkie v. Richmond, 155 Mass. 188, 29 N. E. 770; Bentley v. Root, 19 R. I. 205, 32 Atl. 918; St. Louis Safe Dep. Bank v. Kennett's Estate, 101 Mo. App. 370, 74 S. W. 474.

There is no suggestion here that defendants either knew or had any reason to suspect that they, in constructing the buildings or other structures, were trespassing upon or interfering with the right of way of the complainant or its lessor. There was no record in existence from which defendants, or those under whom they claim, could have learned that the Atlantic & North Carolina Railroad owned or claimed a right of way beyond the actual boundaries of the track and the drain, or beyond the fences on the lots upon which they reside and those adjoining them, as the road was located through the town.

An examination of the county records would have disclosed that the right of way lying west of the town commons, for which the company took deeds, was confined to 35 feet on each side of the track. The course pursued by the company in locating its track and drains, and permitting for many years the owners of abutting lots to build fences and erect structures, was well calculated to create, and it is quite certain did create, the belief that it claimed a right of way through the lots which constituted the town commons of the same width as through the Washington and other property to which it took deeds. I do not entertain any doubt of the absolute good faith and well-founded belief on the part of the citizens of Kinston, including the defendants, that neither the Atlantic & North Carolina Railroad Company nor its lessees claimed more than the width of the right of way included in the deeds from Washington and others. If this were a controversy respecting a private way, I would not hesitate to deny the mandatory injunction, and leave the complainant to its action at law for damages; but it is manifest that, by reason of the relation which the complainant bears and its duty to the public, a judgment for damages would be totally inadequate to meet the situation.

Complainant will incur very heavy penalties, fixed by the state statute at $500 a day, for failing to erect and maintain with the Atlantic Coast Line Railroad the union depot at the place fixed by the commission. The court may avail itself of knowledge acquired by personal examination and the uncontradicted affidavits, with accompanying maps, that certainly a portion of the land covered by its right of way, upon which defendants' dwellings and other structures are located, will be necessary for the laying of tracks, etc., to enable complainant to move its trains and cars into and out of the union depots. As said in Joy v. St. Louis, 138 U. S. 1, 49, 11 Sup. Ct. 243, 258 (34 L. Ed. 843):

"In the present case, the remedy in damages by an action at law would be entirely inadequate, and nothing short of the interposition of a court of equity would provide for the exigencies of the situation." Wilson v. Northampton, etc., Railway Co., L. R. 9 Ch. 279.

"Railroads are common carriers and owe duties to the public. The rights of the public in respect to these great highways of communication should be fostered by the courts; and it is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public in the progress of trade and traffic, by new methods of intercourse and transportation." Id.'

With these equitable principles and precedents in mind, we must deal with the difficult situation presented in this case, with an anxious desire to preserve the rights of complainant, enable it to discharge its public duties, and, so far as possible, protect the defendants, who, without fault on their part, have encountered the march of progress of an ancient village to a modern commercial town. In the realization of the vision of William Heritage that "Adkins Banks is a pleasant and healthy situation and commodious for trade and commerce," his plan for a "town commons" has been made to give way to the demands for "town lots" and these defendants must "move out." One cannot but regret that the public spirit which prompted Col. Washington, with his broad acres, did not express itself in the grant of the standard right of way of 200 feet. This would have put the public upon notice of the width of the way claimed by the company through the town. But, as in so many other instances, each generation deals with its problems from its own viewpoint, and those who come after must take the succession cum onere, and deal with conditions as they arise.

Keeping in view the fact that the appeal of complainant to the injunctive power of the court is because of the inadequacy of the only remedy which a court of law has the power to render, it must also be kept in view that, in granting the remedy, regard must be had to the equities to which defendants are entitled, and to so mold the decree that, so far as possible, substantial justice be done to all parties. It is manifest that to command the defendants, at their own cost and expense, to remove or, if this be not possible, to destroy their residences, depriving them, not only of their property, but of their homes, without compensation, would be harsh and oppressive. The court must keep in view the language of the learned Master of the Rolls, Sir George Jessell, that all of the circumstances of the case must be taken into consideration, that not only the injury to plaintiff, but also the amount which has been laid out by defendants, the circumstances under which the expenditure was made, the long time during which the rights of complainant were unknown, the good faith with which all parties have acted, and must anxiously endeavor to conserve and guard the rights of all concerned.

No final decree should be made until the parties have had opportunity to endeavor to come to a fair adjustment of their rights, or until the court is better informed in respect to the extent to which the necessity of complainant demands the use of the land—the practicability of removing the dwellings on other parts of the lots and the cost of doing so. The case has been heard upon affidavits, in which these questions are left in uncertainty. It has been pending for an unusual length of time, because of the intervention of the war, resulting in

the taking over by the government of the operation of complainant's roads, and the recognition on the part of all concerned that it was impracticable to comply with the orders of the Corporation Commission until the property was restored to the complainant. It is conceded that the public convenience and safety demands the construction of the union depot at Kinston. These conditions call for a declaration and adjustment of the rights of complainant and defendants.

A decree will be signed, adjudging the right of complainant to a right of way of 100 feet from the center on each side of its track over the lands described in the bill, as shown on the plats in evidence. A reference will be had to three commissioners, to be named by the court, with direction to make an examination of the lots occupied by defendants separately and report:

(1) The number of feet over each lot which may be reasonably necessary, in their opinion, for the occupancy of complainants for side tracks or other purposes, to enable it, after the construction of the union depot, to safely and conveniently move its trains, either passenger or freight, to and from such depot.

(2) The size of each lot, and whether the several dwellings thereon within 100 feet of the center of complainant's track may be moved on other portions of each lot, and, if so, the probable cost of making such removal.

(3) If either of such dwellings cannot be moved on other parts of the lot of the owner, to recommend to the court such plan for moving such dwelling on other lots near by, together with an estimate of the cost of purchasing such lot or lots and of moving the dwellings thereon.

(4) Such other information which the commissioners may, in their judgment, deem relevant or of value to the court in dealing with the conditions which they may find.

The commissioners will, at as early a day as convenient to themselves and the parties, and after notice thereof, enter upon the premises, cause maps or surveys thereof to be made, showing the size, shape, location relative to streets and other lots, and the location of the buildings thereon, and hear, at a time and place to be fixed by them, such evidence, oral or written, as may be offered by the parties. They will have the evidence, so taken stenographically, written out and sent to the court, together with all documents, maps, plats, etc., which may be offered, with a report of their conclusions and recommendations in the premises. Such report will not be binding upon the court, but for its information and aid in framing a final decree therein. The cause will be retained for other and further orders, etc.